IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| KATHY CLARK, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action No.  1:12-CV-00174-SS |
| CENTENE CORPORATION, CENTENE | ) | |
| COMPANY OF TEXAS, L.P., AND | ) | |
| SUPERIOR HEALTHPLAN, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CENTENE COMPANY OF TEXAS, L.P'S
MOTION FOR SUMMARY JUDGMENT**

**DEFENDANT CENTENE COMPANY OF TEXAS, L.P.'S
MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant Centene Company of Texas, L.P. ("Centene Texas"), and for its Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 on all counts of Plaintiffs' Original Complaint, states as follows:

## INTRODUCTION AND BACKGROUND

Named Plaintiffs Kathy Clark, Amy Endsley, Susan Grimmett, Margueriette Schmoll, and Kevin Ulrich, along with twenty-five opt-in plaintiffs (collectively "Plaintiffs"), are licensed nurses and former Centene Texas employees. Doc. No. 1. Plaintiffs collectively allege that during their employment they were improperly classified as exempt from the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), and filed this collective action seeking unpaid overtime pay to which Plaintiffs claim they are entitled. *Id*. Although Plaintiffs actually held five different job titles, all Plaintiffs worked in one of two broad categories: prior-authorization nurse ("PA Nurse") or concurrent review nurse ("CR Nurse").[1]

Summary judgment in favor of Centene Texas is warranted because there is no genuine issue of material fact that Plaintiffs were properly classified as exempt as a matter of law under either the administrative exemption, the learned professional exemption, or both.   In the alternative, Plaintiffs were properly classified as exempt under the combination exemption.[2]

---

[1] Plaintiffs Calabrese, Clark, Deleon, Endsley, English, Grimmett, Guajardo, Hartnagel, Schmoll, Ulrich, and Vaughn were PA Nurses. *Factual Appendix ("App.")*, *1*. The other nineteen Plaintiffs were CR Nurses. *Id.*

[2] Centene Texas disputes that this case is proper for collective treatment. *See* Centene Texas' Motion to Decertify, filed contemporaneously herewith. Nevertheless, Plaintiffs assert that their jobs were the same. Doc. No. 1. Therefore, Centene Texas treats Plaintiffs collectively for the purposes of summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith" if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). A party opposing summary judgment is required to identify the specific evidence in the record that creates a fact issue and to articulate the precise manner in which that evidence supports his claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). The standard for determining whether to grant summary judgment "is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon the record evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990).

The nonmoving party must come forward with competent evidentiary materials establishing a genuine fact issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256-57 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). "Neither 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the nonmovant's burden." *Wallace v. Tex. Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir. 1996).

## ARGUMENT

### I.     Plaintiffs Were Exempt Under the Learned Professional Exemption

To qualify for the learned professional exemption, Plaintiffs' primary duty[3] must have been performing work requiring advanced knowledge, in a field of science or learning, which is

---

[3] "Primary duty" means "the principal, main, major, or most important duty . . . based on all the facts in a particular case." 29 C.F.R. § 541.700(a). Factors to consider in determining an employee's primary duty include, *inter alia*, the relative importance of the exempt duties as compared to other duties; the amount of time spent performing exempt tasks; and relative freedom from direct supervision. *Id.*

customarily acquired by a prolonged course of specialized intellectual instruction.[4] 29 C.F.R. § 541.301(a). "Registered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption," while "licensed practical nurses . . . _generally_ do not qualify." 29 C.F.R. § 541.301(e)(2) (emphasis added).

      A.    **Plaintiffs Possess Advanced Knowledge in a Field of Science or Learning that is Customarily Acquired by a Prolonged Course of Specialized Intellectual Instruction.**

Plaintiffs are all licensed nurses. The field of medicine is a textbook example of a "field of science or learning." 29 C.F.R. § 541.301(c); 29 C.F.R. § 541.301(e)(1-4). Similarly, knowledge "customarily acquired by a prolonged course of specialized intellectual instruction" contemplates professions like medicine, "where specialized academic training is a standard prerequisite for entrance into the profession." 29 C.F.R. § 541.301(d). "The best prima facie evidence . . . is possession of the appropriate academic degree." _Id._

The type of advanced knowledge required for the CR Nurse and PA Nurse positions cannot be acquired at the high school level. Centene Texas requires PA Nurses and CR Nurses to hold either a valid Licensed Vocational Nurse ("LVN") or Registered Nurse ("RN") license. _App. 2_. Licensure requires advanced knowledge customarily acquired through a prolonged course of study, to wit: nursing school. Among other things, minimum requirements for an LVN license include a program of study that includes "both didactic and clinical learning experiences," including a minimum of "558 hours for classroom instruction and 840 hours for clinical practice." Tex. Admin. Code § 214.9(a). Minimum requirements for an RN license include a program of study that includes "both didactic and clinical learning experiences,"

---

[4] To qualify for any of the exemptions at issue, Plaintiffs also must have been "compensated on a salary basis at a rate not less than $455 per week." 29 C.F.R. § 541.600(a). However, Plaintiffs admit that they were compensated on a salary basis, and there is no dispute that Plaintiffs earned in excess of the statutory minimum. _See generally_ Doc. No. 1.

including "at least the equivalent of two (2) academic years." Tex Admin. Code § 215.9(a). Of course, these are only the minimum requirements. Many Plaintiffs have bachelor's degrees, advanced degrees, and additional advanced certifications, which is prima facie evidence that Plaintiffs meet this requirement. *App. 2*.

Furthermore, the law actually required Plaintiffs to have advanced knowledge. Texas law requires that "[p]ersonnel, other than a physician, who obtain oral or written information directly from a patient's physician or other health care provider regarding the patient's specific medical condition, diagnosis, or treatment options or protocols must be a nurse, physician assistant, or other health care provider qualified to provide the requested service." Tex. Ins. Code § 4201.252(b). Accordingly, Centene Texas requires that both CR Nurses and PA Nurses additionally possess a minimum of two to three years of clinical nursing experience in addition to a valid nursing license. *App. 2*.

The Department of Labor regulations presuppose that the nineteen Plaintiffs who are Registered Nurses are exempt. 29 C.F.R. § 541.301(e)(2). However, that exemption is also equally applicable to the remaining Plaintiffs who are LVNs. In the context of acquisition of specialized knowledge, "the word 'customarily' means that the exemption is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction." 29 C.F.R. § 541.301(d); *see also Pippins v. KPMG LLP*, No. 13-889-CV, 2014 WL 3583899, *13-14 (2nd Cir. July 22, 2014). In this case, LVNs meet this threshold.[5] The combination of two to three years of

---

[5] The learned profession exemption is normally not available to LVNs in a clinical setting precisely because their jobs do not typically carry with it the same education, experience and responsibility as an RN, and indeed in a clinical setting LVNs often report to and are supervised by RNs. *App 3*. That is not the case here, however, where all

required clinical experience over and above the required intellectual instruction entitles LVNs to the learned professional exemption in this context.

### B.   Plaintiffs' Work Was Primarily Intellectual in Character and Required Consistent Exercise of Discretion and Judgment.

Work that requires advanced knowledge is "predominantly intellectual in character," and includes "work requiring the consistent exercise of discretion and judgment." 29 C.F.R. § 541.301(b). Plaintiffs' academic and clinical experience combined with the job duties described above leads to the conclusion that Plaintiffs, in this context, met the learned professional exemption test. Indeed, at least one other court has reached the same conclusion on similar facts. *See Withrow v. Sedgwick Claims Management, Serv., Inc.*, 841 F.Supp.2d 972, 986-87 (S.D. W.Va. 2012) (RN utilization review nurse/telephonic case manager within the learned professional exemption); *see also Rieve v. Coventry Health Care, Inc.*, 870 F.Supp.2d 856 (C.D. Cal. 2012) (RN case manager not engaged in direct patient care within learned professional exemption).[6]

Although not separately defined under the learned professional exemption, the administrative exemption regulations help frame this analysis[7], positing that "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been

---

nurses have the same degree of responsibility, are peers, and all positions require a combination of licensure and clinical experience. *Id.*

[6] Indeed, the *Rieve* court noted that it was "not aware of any case . . . in which a case manager or a registered nurse in any position has not been deemed a professional exempt from FLSA coverage." *Rieve*, 870 F.Supp.2d at 864.

[7] The administrative exemption is helpful, albeit distinguishable. Notably absent from the professional exemption language is the requirement that employees exercise *independent* discretion and judgment. 29 C.F.R. § 541.301(b); *Pippins*, 2014 WL 3583899 at *4. Indeed, "the Secretary of Labor has recognized that the discretion and judgment standard for the professional exemption is 'less stringent' than the discretion and independent judgment standard of the administrative exemption." *Id.* at *5 (internal citation omitted). "[T]he professional exemption is characterized by 'application of special knowledge or talents with judgment and discretion.'" *Id.* The "learned professions exemption applies if workers rely on advanced knowledge of their specialty to exercise discretion and judgment that is characteristic of their field of intellectual endeavor." *Id.* at *7.

considered." 29 C.F.R. § 541.202(a). "The phrase discretion and independent judgment must be applied in the light of all the facts involved in the particular employment situation in which the question arises." 29 C.F.R. § 541.202(b). Learned professional employees use the "advanced knowledge to analyze, interpret, or make deductions from varying facts or circumstances." *Id*. Such knowledge "cannot be attained at the high school level." *Id*.

Employees who exercise discretion and judgment have "authority to make an independent choice, free from immediate direction or supervision . . . even if their decisions or recommendations are reviewed at a higher level." 29 C.F.R. § 541.202(c). Indeed, "unlimited authority and absence of review," such that the employee's decision is final, is not required. *Id.* "[T]hat an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment." *Id.*

By definition, medical "[u]tilization review is an <u>assessment</u> by a medical professional . . . to <u>determine</u> whether the treatment is necessary." *Withrow*, 841 F.Supp.2d at 981 (emphasis added). Prior authorization is the process by which requests are "<u>assessed</u> for medical necessity[8] and appropriateness of the health services proposed, including the setting in which the proposed care will take place." *App. 4*. "Medical necessity <u>determinations</u> are made by appropriate professionals, who have a current and unrestricted license, and include <u>decisions</u> about covered medical benefits defined by the Plan . . .." *Id.* (emphasis added).

---

[8] "Medically necessary services are those that are: appropriate and consistent with the diagnosis. . . and the omission of which could adversely affect the Member's medical condition; compatible with the standards of acceptable medical practice in the community; provided in a safe, appropriate and cost-effective setting given the nature of the diagnosis and the severity of the symptoms; . . . [and] there must be no other effective and more conservative or substantially less costly treatment, service, and/or setting available." *App. 4*.

1.      **Plaintiffs Had Authority to Interpret Management Policies.**

Interpretation of management policies was fundamental to Plaintiffs' work. Plaintiffs regularly and customarily applied policies, including Centene Texas' internal policies and procedures (which Plaintiffs were required to use before turning to other industry-wide guidelines like Interqual), to patients' clinical information. *App. 5*. Even a cursory review of the types of policies at issue reveals that significant interpretation using medical knowledge and experience is required to navigate and interpret the policies and apply them to clinical records.

a.      **The Applicable Policies Required Significant Interpretation.**

For example, Centene Texas' physical therapy policy, which was regularly used by several Plaintiffs, asks the nurse to determine, *inter alia*, if the "member exhibits signs and symptoms of physical deterioration or impairment" in the areas of "sensory/motor ability, functional status—as evidenced by inability to perform basic activities of daily living, cognitive/psychological ability, cardiopulmonary status, or speech/language/swallowing ability." *App. 6*. Furthermore, the same policy requires the nurse to determine if the "ordered treatment meets accepted standards of discipline-specific clinical practice, and is targeted and effective in the treatment of the Member's diagnosed impairment condition." *Id*.

The Interqual guidelines are equally complex and technical and require a similar degree of interpretation, utilizing medical knowledge and experience, to apply them.[9] For example, the Interqual guidelines for "Adult Acute Coronary Syndrome," also used by Plaintiffs, ask the nurse to cull out and identify from the clinical record if the patient has "positive cardiac biomarkers,"

---

[9] Furthermore, the guidelines clearly state that they are not intended to be the exclusive source for coverage decisions. For example, Interqual instructs that "[t]he Criteria are intended solely for use as screening guidelines with respect to the medical appropriateness of healthcare services and not for final clinical or payment determinations concerning the type or level of medical care provided, or proposed to be provided, to a patient." *App. 22*.

"rest angina" or "increasing angina duration, frequency or intensity," and an ECG that shows either "ST depression, T wave inversion, or pacemaker rhythm." *App. 7.* Similarly, the Interqual guideline for "Physical Therapy Ongoing" asks the nurse to identify if the patient has an "incapacitating mental illness" or "severe physical impairment." *Id.*

Highly technical, interpretive, medical criteria such as these permeate all of the relevant guidelines, and require "advanced knowledge to analyze, interpret, or make deductions from varying facts or circumstances." 29 C.F.R. § 541.202(b). Importantly, Plaintiffs had authority to authorize requests with no oversight based solely on their interpretation and application of the policies[10] to patients' clinical information. *App. 8.*

> ### b. Plaintiffs Admit that Interpretation and Judgment were Required.

This level of complexity and critical thinking was not lost on Plaintiffs. Plaintiffs' admissions in their own description of their jobs support this conclusion. For example, a number of Plaintiffs admitted in their interrogatory answers that they reviewed medical records and identified the "pertinent" or "appropriate" information to determine if the requested admission was medically necessary, and that when necessary they prepared "summaries" of the "pertinent" or "appropriate" medical information to permit the medical director to make a determination. *App. 23.* What Plaintiffs are describing are judgment calls, requiring the exercise of discretion and judgment.[11]

Resumes drafted by Plaintiffs similarly describe their exercise of discretion and judgment. For example, Plaintiff Valdez admits in her resume that she acted "as a clinical resource[] to referral staff and [made] appropriate referrals" and "provide[d] patient and provider

---

[10] Plaintiffs also used their judgment to decide which policy they believed to be most applicable. *App. 9.*

[11] Plaintiff Cantu further admitted, for example, that her job duties included "discharge planning" and "train[ing] new hires." *App. 23.*

education." *App. 24*. Plaintiff Garcia admits that her job duties included "evaluations of level of care appropriateness and payer-driven initiatives as well as collaborating with other members of the health care team to ensure the above." *Id*. Plaintiff Hodsdon's resume states that she "coordinat[ed] discharge planning needs" and "provid[ed] appropriate referrals to disease management, community based programs, and provider assistance services, to effectively reduce the number and frequency of [h]ospitalizations." *Id*. Plaintiff Calabrese's resume states that she "work[ed] with internal and external entities to investigate and determine steps for resolving complaints, appeals and to determine facts," that she "maintain[ed] appropriate documentation and support for all requests," and that she "prepare[d] documentation and support and present[ed] potential denials to the Medical Director." *Id*. Plaintiff De Leon states that she "act[ed] as clinical resources [sic] to referral staff and [made] appropriate referrals," and that she "provide[d] provider education." *Id*. These are not mere puffery; they are admissions.

Plaintiffs' performance evaluations also evidence the discretionary nature of their jobs. Plaintiffs were reviewed on both the subjective quality of their authorizations and the quality of their clinical decisions, including their application of the guidelines to the clinical record. *App. 25*. If Plaintiffs' jobs truly required no discretion or judgment, Plaintiffs should have achieved 100% accuracy in both categories. However, this was neither the case nor the expectation. *Id*. Indeed, the expectation was that Plaintiffs would achieve 95% accuracy on their internal audits. *Id*. Separately, Plaintiffs were tested annually on their Interqual application proficiency. *App. 26*. Tellingly, the expectation on that test was that Plaintiffs would only need to achieve 80% accuracy. *Id*. If Plaintiffs were truly data entry clerks performing key-word searches, then the fact that achieving anything short of 100% accuracy was possible, let alone acceptable, would be inexplicable.

### c.      Centene Texas Instructed Plaintiffs to Use Discretion and Judgment.

Finally, Plaintiffs were specifically expected by Centene Texas to exercise discretion and judgment in the performance of their job duties. For example, Plaintiffs were instructed that among the "core review steps" is "discuss[ing] concerns and alternatives." *App. 27*. Plaintiffs were also instructed to evaluate the "appropriate level of care, appropriateness of tests/interventions, complications, unrelated conditions, and discharge planning," and to "identify secondary comorbidities, the current and future plan of care, and to begin to prepare for discharge." *Id*. Plaintiffs were tasked with exploring "opportunities for fee negotiation," and in cases where they disagreed with the hospital, to talk to the case manager, talk to the treating physician or nursing staff, share their concerns, listen to the physician's explanation, and offer options. *Id*. Importantly, several Plaintiffs acknowledge that these very descriptors accurately portrayed their jobs. Indeed, some Plaintiffs explicitly testified that when they discovered a patient that did not qualify for a request, they would not merely deny a request but would discuss possible alternatives with the hospital staff in order to explore the acceptability of a different course of action. *App. 28*.

Indeed, Plaintiff Valdez's self-evaluation proclaimed that she "demonstrate[d] critical thinking with quick execution based on clinical received and nursing experience on a daily basis in respect to processing [her] cases." *App. 10*. Plaintiff Sparrow's self-evaluation touted that she "use[d] critical thinking while doing [her] job to obtain the best outcome from the long term benefit of the company," and that she was "able to perform complex tasks in [her] area of expertise and [was] able to teach and assist coworkers and new hires as needed."[12] *Id*.

---

[12] Similarly, Plaintiff Cervantez's supervisor wrote that Plaintiff Cervantez "uses her critical thinking skills in her decision making process" and that she was "able to participate in NICU and Medical rounds in a clear and accurate manner," Plaintiff Cervantez agreed by confirming the evaluation. *App. 10.*

### 2.     Plaintiffs' Work Affected Business Operations to a Substantial Degree.

As previously described, Plaintiffs were responsible for reviewing requests for medical necessity and coverage. Centene Texas is contractually obligated to provide this service for the State of Texas. *App. 11*. Plaintiffs' determination ultimately resulted in either the request being approved (and paid for at a potentially significant cost), or the request potentially being denied, which would have significant ramifications for the patient. Moreover, poor performance of Plaintiffs' job duties could have ultimately resulted in termination of Centene Texas' contract with the State of Texas, which would have had even more significant ramifications for Centene Texas.

### 3.     Plaintiffs Had Authority to Commit Centene Texas in Matters with Significant Financial Impact.

Similarly, Plaintiffs had authority to commit Centene Texas in matters with significant financial impact. Again, Plaintiffs had virtually unchecked authority to approve requests based solely on their analysis of patients' clinical information and their application of the guidelines. *App. 8*. Approving a hospital admission with all of the attendant healthcare costs, for example, involves a significant financial impact.

### 4.     Plaintiffs Had Authority to Deviate from Policies Without Approval.

As set forth more fully below, the applicable guidelines were subject to substantial individual interpretation. Moreover, the clinical records, which could be very lengthy and replete with medical terminology, lab results, test results, medical histories, and other highly technical medical information, also required interpretation and analysis. *App. 12*. Plaintiffs did not require approval to authorize a request if Plaintiffs concluded, based on their education and training, that the circumstances arguably met the guidelines. *App. 8*. Plaintiff Ulrich even instructed a Referral

Specialist that the Referral Specialist could approve podiatry requests on Plaintiff Ulrich's authority, presumably without applying any guidelines whatsoever. *App. 13*.

### 5.    Plaintiffs Provided Expert Advice to Management.

Centene Texas' internal policies and procedures concerning medical necessity were constantly reviewed and revised, and as Plaintiffs were responsible for interpreting and implementing them on a day-to-day basis, they were often called upon to advise management when additional policies were needed to "fill a gap," or when policies needed to be revised to make them more useful. *App. 14*. By way of example, Plaintiff Ulrich educated his boss, and his team, about how to identify high-frequency hearing loss from a hearing test report, and Plaintiff Hartnagel identified and took it upon herself to correct mistakes made by Referral Specialists. *App. 29*. Plaintiff Hartnagel also created her own procedures for a number of medical procedures and treatments, and with the approval of her supervisor, distributed those procedures to her team. *App. 15*. Plaintiff Hartnagel created and distributed a detailed PowerPoint presentation on how to properly handle DME (durable medical equipment) requests. *Id*. Plaintiff Schmoll detected and remedied provider fraud by alerting management. *App. 29*.

Even in those cases in which Plaintiffs felt they could not approve a request because it did not, in their opinion, meet guidelines, they would then submit the requests to a medical director for further review.  But Plaintiffs did not merely pass the file on the medical director. Rather, Plaintiffs were responsible for providing the medical director with a detailed narrative summary of the accurate clinical picture and their assessment of the case. *App. 16*. The nurse's narrative was typically all the information the medical director would use to decide the case. *Id*. Culling out the "necessary" clinical information that the medical director needed to make a determination itself required discretion and judgment. Plaintiffs would even make recommendations to the medical director to either approve a request that Plaintiffs concluded did

not meet guidelines, and in some cases would even recommend that the medical director deny a request that actually met guidelines. *App. 17.*

### 6.   Plaintiffs Were Free from Immediate Supervision and Direction.

Other than spot checking Plaintiffs medical assessments on a monthly basis, Plaintiffs worked with virtually no daily oversight. *App. 18*. Each carried their own case load. *Id*. Many Plaintiffs worked from home and did not even report to a Centene Texas office, and many spent a large portion of their day independently working in hospitals reviewing cases without supervision. *Id*. Furthermore, as previously stated, Plaintiffs were able to authorize requests without supervisor or medical director approval, and even when they could not approve a request, Plaintiffs frequently recommended the proper outcome. *App. 8, 17.*

### C.   Plaintiffs' Use of Guidelines Does Not Defeat Exempt Status.

Plaintiffs make much of the fact that they utilized guidelines in determining whether a treatment was medically necessary.  However, it is well-settled that "[t]he use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific . . . or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption . . .." 29 C.F.R. § 541.704. Plaintiffs' assertion that the guidelines vitiated their use of discretion and judgment is illusory.

Importantly, Texas law <u>requires</u> the use of these guidelines in utilization review, albeit in an appropriate manner. Specifically,

> (a) A utilization review agent [Centene Texas] <u>shall use written medically acceptable screening criteria and review procedures</u> that are established and periodically evaluated and updated with appropriate involvement from physicians, including practicing physicians, dentists, and other health care providers.

> (b) A utilization review determination shall be made in accordance with currently accepted medical or health care practices, taking into account special

circumstances of the case that may require deviation from the norm stated in the screening criteria.

(c) Screening criteria must be: (1) objective; (2) clinically valid; (3) compatible with established principles of health care; and (4) <u>flexible enough to allow a deviation from the norm when justified on a case-by-case basis.</u>

Tex. Ins. Code, § 4201.153 (emphasis added). Centene Texas' compliance with Texas law by requiring Plaintiffs to utilize medically acceptable screening criteria does not vitiate Plaintiffs' exercise of independent discretion and judgment, particularly where, as here, the guidelines themselves reflect the very type of "scientific . . . or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills." 29 C.F.R. § 541.704.

From its review of the examples provided, the Court may easily conclude that the guidelines used by these nurses relate to "highly technical, scientific" matters "that can be understood or interpreted only by those," like Plaintiffs, "with advanced or specialized knowledge or skills." Simply put, in today's world the application of standard courses of action does not vitiate the concept of the learned professional. This is the underlying understanding the Fifth Circuit recognized in *Owsley v. San Antonio Independent School Dist.*, 187 F.3d 521 (5th Cir. 1999). Considering application of the learned professional exemption to high school athletic trainers, the court found the trainers exempt professionals even though "over 45 of the 77 enumerated responsibilities set forth in the guidelines require[d] the trainers to act under standard treatment guidelines" and "the remaining 30 or so responsibilities [were] routine acts that [did] not require the application of specialized knowledge or training." *Id.* at 526; *see also Rieve*, 870

F.Supp.2d at 865 (although manual contained guidelines as to handling of each case, plaintiff "must still deal with the individual intricacies of each patient's care.").[13]

Moreover, Plaintiffs grudgingly admit as much. For example, when questioned about the Interqual policy for "Acute Gastrointestinal/Biliary/Pancreatic," Plaintiff Hunter testified as follows:

> Q: Okay. Again, could a person who was not a nurse go through this [Interqual] and understand it?
>
> A: No, I don't think so.
>
> Q: Okay. You used your nursing skills in order to go through these criteria I assume?
>
> A: Yes.
>
> *App. 19.*

When questioned about her use of the guidelines, Plaintiff Clark testified as follows:

> Q: Do you think that someone without a nursing background could have done the job that you did at Centene?
>
> A: No.
>
> Q: Why do you think a nursing background was required?
>
> A: To understand the medical terminology.
>
> . . .
>
> Q: Do you think that someone who was educated in medical terminology could have done the job?
>
> A: No.

---

[13] By way of further example, it is beyond dispute that the use of generally accepted accounting principles and professional guidelines does not mean that an accountant is not a learned professional. *See, e.g., Pippins v. KPMG LLP*, 921 F.Supp.2d 26, 51-52 (S.D.N.Y. 2012) (audit associates who followed detailed guidelines and used computer software were learned professionals), *aff'd, Pippins,* 2014 WL 3583899. Neither does the use of medical standards mean that a physician is not a learned professional. *Pippins*, 2014 WL 3583899 at *10. Similarly, pharmacists are learned professionals despite following standard operating procedures. *De Jesus-Rentas v. Baxter Pharmacy Servs. Corp.*, 400 F.3d 72 (1st Cir. 2005).

. . .

Q: So what from your experience as a nurse informed the way you did your job when you worked at Centene? How did you use your nursing experience when you were performing your job duties at Centene?

A: Based on the information I saw and applying it to the criteria that was listed or available.

Q: And you don't believe that someone who had no clinical nursing background could have done that?

A: No.

*App. 20.*

Plaintiff Ulrich even found Interqual "rather limited," and speculated that it may soon become "obsolete." *App. 21.*

In light of the foregoing, including Plaintiffs' own admissions, the Court should find as a matter of law that Plaintiffs' work was primarily intellectual in character and required advanced knowledge to analyze and interpret both clinical records and the applicable guidelines. Even Plaintiffs themselves admit that their medical training and experience was necessary to perform utilization review work. *App. 19-20.* This Court should grant summary judgment in Centene Texas' favor.

## II.     Plaintiffs Were Also Exempt Under the Administrative Exemption

To qualify for the administrative exemption, Plaintiffs' primary duty must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and must include "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. 541.200(a); *see also Talbert v. Am. Risk Ins. Co.*, 405 Fed.Appx. 848, 852 (5th Cir. 2010).

A.  **Plaintiffs' Primary Duty was Performing Office or Non-Manual Work that was Directly Related to Centene Texas' Business Operations and its Customers.**

There can be no dispute that Plaintiffs performed office or non-manual work.[14] To have performed work "directly related to the management or general business operations," Plaintiffs must have performed "work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). This includes, for example, work in functional areas such as insurance and safety and health. 29 C.F.R. § 541.201(b). Plaintiffs may meet this test whether they performed this work for either Centene Texas or its customers. 29 C.F.R. § 541.201(c).

There also can be no genuine issue of material fact as to whether Plaintiffs' work was directly related to the management or general business operations of Centene Texas or its customers. Centene Texas' business is administering government sponsored health insurance plans. *App. 31*. Centene Texas is not unlike other health insurance companies, except that its policyholders are states rather than employers or individuals, and its "members" are those who obtain benefits from the State of Texas. *Id.* Among numerous other administrative functions, Centene Texas processes claims for payment of medical expenses from members and verifies that those claims are both covered and medically necessary. *Id.*

Plaintiffs' primary duty was reviewing either requested services (PA Nurses) or inpatient admissions (CR Nurses) for members and verifying that the services or admissions were medically necessary and covered. *App. 32*. In this role, Plaintiffs directly assisted with servicing

---

[14] Plaintiffs' Complaint at Paragraph 1.4 alleges that each Plaintiff was "working in a call center environment." A number of Plaintiffs now admit that this characterization is simply untrue. *App. 30*.

not only Centene Texas' business, the administration of health plans, but also Centene Texas' customer—the State of Texas.

*Withrow v. Sedgwick Claims Management Serv., Inc.*, 841 F.Supp.2d 972 (S.D. W. Va. 2012), is analogous and illustrates this point. In *Withrow*, the defendant was a third-party administrator of workers' compensation and other insurance claims that were funded by the State of West Virginia. *Id.* at 974. The plaintiffs in *Withrow* were claims examiners (claims adjusters) and a utilization review nurse who managed workers' compensation claims, and whose roles were similar to Plaintiffs' roles in this case. *Id.* The *Withrow* court rejected the plaintiffs' contention that they were production workers, instead holding that "[defendant's] customer, the State of West Virginia, provided workers' compensation insurance to claimants, and the plaintiffs administered these claims, rather than produced or sold a product." *Id.* at 979-80; *see also Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585 (5th Cir. 2006) (duties of claims adjusters constitute employer's administrative operations and directly relate to management or business operations as distinguished from production).[15] So, too, did Plaintiffs' primary duty constitute Centene Texas' administrative operations and serve its customer. Thus, Plaintiffs met the second prong of the administrative exemption.

### B.    Plaintiffs' Primary Duty Involved the Exercise of Discretion and Independent Judgment with Respect to Matters of Significance.

As more fully set forth in Centene Texas' arguments with respect to the learned professional exemption, *supra*, there is no genuine issue of material fact that Plaintiffs exercised

---

[15] For similar reasons, courts nationwide, including the Fifth Circuit, frequently find that claims adjusters, a job similar to that of Plaintiffs in this case only typically dealing with a different type of insurance claim, qualify for the administrative exemption. *See, e.g., Withrow*, 841 F.Supp.2d 972; *Cheatham*, 465 F.3d 578; *Talbert*, 405 Fed.Appx. 848; *In Re Farmers Ins. Exchange, Claims Representatives' Overtime Pay Litigation*, 481 F.3d 1119 (9th Cir. 2007); *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865 (7th Cir. 2008).

independent discretion and judgment with respect to matters of significance. Thus, Plaintiffs also met the third prong of the administrative exemption test.

Having established all three prongs of the administrative exemption test, the Court should find as a matter of law that Plaintiffs were also properly classified as exempt under the administrative exemption, and should grant summary judgment in Centene Texas' favor for this additional reason.

### III.    In the Alternative, Plaintiffs Qualified for the Combination Exemption.

Even assuming, *arguendo*, that Plaintiffs did not fully qualify for the administrative exemption, the professional exemption, or both, Plaintiffs were exempt under the combination exemption. "Employees who perform a combination of exempt duties as set forth in the regulations in this part for . . . administrative" and "professional . . . employees may qualify for exemption." 29 C.F.R. 541.708. Based on the foregoing analysis, the Court should find as a matter of law that Plaintiffs' primary duty involved a combination of exempt learned professional and administrative tasks. Therefore, even if the Court concludes that the administrative and/or professional exemptions do not individually apply, exempt status under the combination exemption is appropriate as a matter of law.

### IV.    Plaintiffs Cannot Establish a Willful Violation.

The statute of limitations applicable to FLSA claims is two years, except where the cause of action arises out of a "willful violation," in which case the statute of limitations is three years. 29 U.S.C. § 255(a). The Fifth Circuit, in recognition of the standard of willfulness affirmed by the United States Supreme Court in *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988), has described the standard as requiring that the "employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *See, e.g., Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1416 (5th Cir. 1990). "The burden of showing that an FLSA violation

was 'willful' falls on the plaintiffs." *Stokes v. BWXT Pantex, LLC*, 424 Fed.Appx. 324, 326 (5th Cir. 2011). Centene Texas has established that there has been no violation. Nevertheless, even assuming, *arguendo*, that Plaintiffs could establish genuine issues of material fact, Plaintiffs still cannot make the requisite showing of willfulness in this case. Therefore, even in the event the Court determines that summary judgment in Centene Texas' favor is not in order, the Court still should determine as a matter of law that the two year statute of limitations applies.[16]

Only where "employers have knowledge that they are violating the FLSA and choose to continue to do so" is their conduct willful. *Lipnicki*, 2014 WL 923524 at *9 (citing *Singer v. City of Waco*, 324 F.3d 813, 821-22 (5th Cir. 2003)). In *Singer*, for example, a management employee admitted he knew the plaintiffs were being paid incorrectly, the defendant canceled a training seminar that would have brought the violations to the plaintiffs' attention, and the human resources director attempted to convince the defendant to study its pay practices, which the defendant's attorney rebuffed. *Id.* at 821-22. Only this type of clearly willful disregard for the law merits a willfulness determination.

Plaintiffs have no evidence that would support a finding of willfulness. For example, "[s]imply failing to seek legal advice concerning its pay practice does not evidence a willful violation of the statute." *Mireles*, 899 F.2d at 1416. Nor does failing to survey employees about their job duties. *Lipnicki,* 2014 WL 923524 at *10. Further, a negligent violation of the statute is not considered willful, and even an employer that acts unreasonably does not commit a willful violation as long as the employer is not reckless. *Mireles*, 899 F.2d at 1416; *Lipnicki*, 2014 WL 923524 at *10.

---

[16] Courts routinely decide the applicable statute of limitations at the summary judgment stage. *See, e.g., McLaughlin*, 486 U.S. 128; *Halferty v. Pulse Drug Co.*, 826 F.2d 2 (5th Cir. 1987); *Allen v. Coil Tubing Servs.,L.L.C.*, 846 F.Supp.2d 678 (S.D. Tex. 2012); *Lipnicki v. Meritage Homes Corp.*, No. 3:10-CV-605, 2014 WL 923524 (S.D. Tex. Feb. 13, 2014).

*Singer* illustrates why there can be no finding of willfulness in this case. Centene Texas' compensation department[17] collaborated with local management to formulate job descriptions and classify jobs based on information about the position's actual job duties. *App. 33*. Moreover, Centene Texas' compensation department obtained and used resources from industry groups and consultants to help inform its pay practices, and used a job duties worksheet when formulating job descriptions as well. *Id*. Robin Lorie DeSalvo, who supervised a number of Plaintiffs, testified that none of the nurses she supervised ever complained or asked her about their exempt status. *Id*. Plaintiffs have no evidence that Centene Texas acted recklessly in classifying Plaintiffs as exempt. Thus, the two year statute of limitations applies as a matter of law.

## V.     Summary Judgment is Warranted with Respect to Several Individual Plaintiffs.

Summary judgment with respect to the following eight individual Plaintiffs is independently warranted.

### A.     Norma Martinez

Plaintiff Martinez voluntarily withdrew from the class. *App. 36*. Despite assurances it would do so, Plaintiffs' counsel never dismissed Plaintiff Martinez's claim. *Id.* Therefore, the Court should grant summary judgment on Plaintiff Martinez's claim at this time.

### B.     Gabriel Mendiola

Plaintiff Mendiola's claim is barred by either statute of limitations. Plaintiff Mendiola opted-in to the class on June 21, 2013. Doc. No. 67-1. Under the three-year statute of limitations, the earliest time for which Plaintiff Mendiola may recover is June 21, 2010, or under the proper two-year statute of limitations, is June 21, 2011. However, Plaintiff Mendiola's employment

---

[17] Centene Texas outsources its compensation function to Centene Management Company. *App. 33.*

ended on March 11, 2010. *App. 34*. Plaintiffs' counsel indicated that Plaintiff Mendiola's claim would be dismissed, but never did so. *App. 37*.

### C.    Christina Vaughn

Plaintiff Vaughn's claim is barred by either statute of limitations. Plaintiff Vaughn opted-in to the class on June 21, 2013. Doc. No. 67-1. Under the three-year statute of limitations, the earliest time for which Plaintiff Vaughn may recover is June 21, 2010, or under the proper two-year statute of limitations, June 21, 2011. However, Plaintiff Vaughn's employment ended on May 28, 2010. *App. 34*. Plaintiffs' counsel indicated that Plaintiff Vaughn's claim would be dismissed, but never did so. *App. 37*.

### D.    Rose Guajardo

Plaintiff Guajardo was neither a PA Nurse nor a CR Nurse. Plaintiff Guajardo was apparently mistakenly included in this class because she had a "case manager" job title. However, Plaintiff Guajardo's sworn interrogatory answers clarify that she did not perform either PA Nurse or CR Nurse job duties. *App. 35*. For example, when asked to describe how she applied guidelines to clinical information to determine medical necessity, she responded "[n]ot applicable." *Id*.

### E.    Cynthia Cantu

Plaintiff Cantu's claim is barred by the applicable two-year statute of limitations. As addressed above, the two-year statute of limitations applies because Plaintiffs cannot establish a willful violation. Plaintiff Cantu opted-in to the class on June 5, 2013. Doc. No. 64-1. The earliest time for which Plaintiff Cantu may recover is June 5, 2011. However, Plaintiff Cantu's employment ended on February 4, 2011. *App. 34*. Thus, Plaintiff Cantu's claim is entirely time-barred.

### F.      Cordelia Garcia

Plaintiff Garcia's claim is barred by the applicable two-year statute of limitations. Plaintiff Garcia opted-in to the class on June 28, 2013. Doc. No. 68-1. Under the two year statute of limitations, the earliest time for which Plaintiff Garcia may recover is June 28, 2011. However, Plaintiff Garcia's employment ended on August 27, 2010. *App. 34*. Thus, Plaintiff Garcia's claim is entirely time-barred.

### G.      Sherri Hodsdon

Plaintiff Hodsdon's claim is barred by the applicable two-year statute of limitations. Plaintiff Hodsdon opted-in to the class on June 5, 2013. Doc. No. 64-1. Under the two year statute of limitations, the earliest time for which Plaintiff Hodsdon may recover is June 5, 2011. However, Plaintiff Hodsdon's employment ended on October 8, 2010. *App. 34*. Thus, Plaintiff Hodsdon's claim is entirely time-barred.

### H.      Margueriette Schmoll

Plaintiff Schmoll's claim is barred by the applicable two-year statute of limitations. Plaintiff Schmoll filed this lawsuit on February 22, 2012. Doc. No. 1-1. Under the two year statute of limitations, the earliest time for which Plaintiff Schmoll may recover is February 22, 2010. However, Plaintiff Schmoll's employment ended on January 27, 2010. *App. 34*. Thus, Plaintiff  Schmoll's claim is entirely time-barred.

## <u>CONCLUSION</u>

Based on the foregoing, Centene Texas has established that there is no genuine issue of material fact that Plaintiffs were properly classified as exempt. Even if a genuine issue does exist, the Court should find as a matter of law that the two-year statute of limitations applies to Plaintiffs' claims.

WHEREFORE, Defendant Centene Company of Texas, L.P., prays for an order granting this Motion for Summary Judgment and for such other and further relief as the Court deems just and proper.

Respectfully Submitted,


BY: */s/ Michael J. Golden*
      Michael J. Golden
      State Bar No. 24032234
      BOULETTE & GOLDEN LLP
      2801 Via Fortuna, Suite 530
      Austin, Texas 78746
      512.732.8902
      512.732.8905 (facsimile)
      mike@boulettegolden.com

      Robert A. Kaiser
      Jovita M. Foster
      Jeremy M. Brenner
      ARMSTRONG TEASDALE LLP
      7700 Forsyth Blvd., Suite 1800
      St. Louis, Missouri 63105
      314.621.5070
      314.621.5065 (facsimile)
      rkaiser@armstrongteasdale.com
      jfoster@armstrongteasdale.com
      jbrenner@armstrongteasdale.com

      ATTORNEYS FOR DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the above and foregoing has been served upon all counsel of record on this 31st day of July 2014, as follows:

David G. Langenfeld
Dunham & Jones, P.C.
1800 Guadalupe Street
Austin, Texas 78701
512.777.7777 (Telephone)
512.340.4051 (Facsimile)
david@dunhamlaw.com

*Via Hand Delivery*

Rachhana T. Srey
Nichols Kaster, PLLP
80 South 8th Street
Minneapolis, MN 55402
612.256.3200 (Telephone)
612.215.6870 (Facsimile)
srey@nka.com

*Via First Class U.S. Mail*

*/s/ Michael J. Golden*
Michael J. Golden
Counsel for Defendants