IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| KATHY CLARK, AMY ENDSLEY, SUSAN GRIMMETT, MARGUERIETTE SCHMOLL, AND KEVIN ULRICH, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiffs,<br><br>vs.<br><br>CENTENE CORPORATION, CENTENE COMPANY OF TEXAS, L.P., AND SUPERIOR HEALTHPLAN, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.  1:12-CV-00174-SS |

**CENTENE TEXAS' MOTION TO DECERTIFY
PLAINTIFFS' COLLECTIVE ACTION CLAIMS**

## CENTENE TEXAS' MOTION TO DECERTIFY
## PLAINTIFFS' COLLECTIVE ACTION CLAIMS

Defendant Centene Company of Texas, LP ("Centene Texas") states as follows for its Motion to Decertify Plaintiffs' Collective Action Claims:

## I.     INTRODUCTION

Plaintiffs Clark, Endsley, Grimmett, Schmoll, and Ulrich ("Plaintiffs") allege that they were misclassified as exempt from the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), because their job duties did not qualify for an exemption. Plaintiffs seek to recover unpaid overtime pay on behalf of themselves and the conditionally certified class of purportedly similarly situated employees.   The parties have engaged in significant discovery in this action, and that discovery has revealed that the named Plaintiffs are in no way similarly situated to those they purportedly represent.   Thus, the Court should decertify Plaintiffs' collective action claims.

## II.    PROCEDURAL HISTORY

Plaintiffs originally filed this action in February 2012 against Centene Corporation, Centene Company of Texas, L.P., and Superior Healthplan, Inc., alleging that they were misclassified as exempt under the FLSA, and therefore are owed unpaid overtime pay.  (Dkt. No. 1).  On January 15, 2013, Defendants filed a Motion for Summary Judgment as to Defendants Centene Corporation and Superior Healthplan, Inc. on the grounds that those entities were not Plaintiffs' employers under the FLSA.   (Dkt. No. 43).   Plaintiffs responded with their own Motion for Partial Summary Judgment on the same issues (and agreeing that Superior Healthplan, Inc. should be dismissed as a defendant).  The Court found that Centene Corporation was not a proper defendant in this action.  (Dkt. No. 50).  Thus, Centene Texas was left as the only defendant in this action.

Plaintiffs had also filed their Motion for Class Certification and Notice on November 30, 2012.  (Dkt. No. 54-2).  After briefing, the Court held on May 8, 2013 that Plaintiffs had satisfied the "minimal showing" required for conditional certification of a collective action, but reserved the opportunity to revisit certification after discovery, at which time a more stringent standard would be applied.  (Dkt. No. 62).  In doing so, the Court conditionally certified a class of "All current and former nurses in job titles 'Case Manager/Pre Certification,' 'Case Manager/Prior Authorization,' and nurses working in 'utilization management,' who worked for Defendant at any Centene Company of Texas, L.P. (Superior Health Plan) location throughout the State of Texas since February 22, 2009, who were classified as exempt and not paid overtime compensation…and whose job duties included applying pre-determined criteria and guidelines to a patient's medical data in response to requests by medical providers for the authorization of services."  Since the filing of the lawsuit and mailing of notices, an additional 25 Plaintiffs have joined the putative class, for a total of 30 Plaintiffs.[1]  Since the May 8, 2013 Order (the "Conditional Certification Order"), the parties have engaged in extensive discovery.

## III.   FACTS

In their original Motion for Class Certification and Notice, Plaintiffs alleged that they were Licensed Vocational Nurses ("LVNs") and Registered Nurses ("RNs") who were employed by Centene Texas at its Austin, Texas office.  (Dkt. No. 54-2, p. 1).  Plaintiffs were classified as exempt employees under the FLSA, and thus did not receive any overtime compensation.  *Id.* Plaintiffs contend that all nurses should be classified as non-exempt and paid previously unpaid overtime for any time worked beyond forty hours per workweek.

---

[1] Centene Texas is separately moving for summary judgment as to eight (8) individual Plaintiffs' claims being time-barred under the FLSA statute of limitations or because of Plaintiffs' counsels' representations that their claims would be withdrawn.

The State of Texas contracts with Centene Texas to manage its Medicaid program.  *App. 1.*  Centene Texas is required under its contract with the State of Texas to engage in utilization review: evaluating a variety of medical procedures for medical necessity and insurance coverage.  *Id.*  The contract requires Centene Texas to review, evaluate, and authorize medically necessary procedures within two or three days of first receiving a request from a patient or provider, depending on the type of request.  *Id.*  Importantly, the Texas regulations require that "[p]ersonnel who obtain information regarding a patient's specific medical condition, diagnosis and treatment options or protocols directly from the physician, dentist or health care provider…**shall be nurses,** physicians assistants, or health care providers **qualified to provide the service requested by the provider**."  Tex Admin. Code § 19.1706 (emphasis added).

Centene Texas employs different categories of nurses to handle different job duties within the utilization review process: pre-certification nurses, prior authorization (or preauthorization nurses), and concurrent review nurses.  *App. 2.*  Pre-certification and prior authorization nurses perform functionally identical jobs and review requests for medical services and determine whether those medical services are medically necessary in an out-patient setting.[2]  *App. 2, 3.*  In contrast, concurrent review nurses ("CR Nurses") review whether procedures are medically necessary for in-patient care.  *App. 3.*  All of the named Plaintiffs worked only as PA Nurses.  *App. 2.*  The conditionally certified collective of 30 individuals includes 20 CR nurses and 9 PA nurses.[3]  *Id.*

PA Nurses evaluate requests from medical providers to perform (and subsequently be paid for) medical procedures.  *App. 4.*  Once received by Centene Texas, a Referral Specialist

---

[2] For purposes of this Memorandum, pre-certification, prior authorization, and preauthorization nurses will simply be referred to as "PA Nurses."

[3] One opt-in Plaintiff, Rose Guajardo, was neither a PA Nurse nor a CR Nurse.  As noted in Centene Texas' Motion for Summary Judgment as to Plaintiff Guajardo, she was apparently mistakenly included in this class because she had a "case manager" job title.

processes the request into Centene Texas' care management system. *Id.*  The Referral Specialists are non-clinical employees who are responsible for taking the information from the request form and entering it into Centene Texas' care management system. *Id.*  The Referral Specialists' function is primarily data entry of the insurance member's personal information and a basic summary of the service is being requested. *Id.*  Several Plaintiffs acknowledged that Referral Specialists could not perform the job of PA Nurses. *Id.*

After processing by the Referral Specialist, the request is sent to a PA Nurse. *App. 4.*  In reviewing the request, the PA Nurse relies on their nursing experience to then analyze the request under the guidelines provided by Centene Texas. *App 5.*  If the request meets the guidelines for medical necessity, the PA Nurse approves it, though PA Nurses can recommend against a procedure even if the guideline criteria is met. *Id.*  Further, Texas statutes require PA Nurses to evaluate medical necessity in each case, "taking into account special circumstances of the case that may require deviation from the norm stated in the screening criteria." Tex. Ins. Code Ann. § 4201.153.

Although claiming to serve in a representative capacity, the named Plaintiffs testified uniformly that they have no knowledge about other offices, other nurses, other jobs, others' job duties, or others' hours of work.  This is particularly true concerning the duties of CR Nurses. *App. 6.*  For example, Plaintiff Grimmett testified that as a PA Nurse she was unaware of the duties of CR Nurses.[4]  *Id.*  Plaintiff Ulrich stated that he had no knowledge or familiarity regarding the job duties for CR Nurses. *Id.*  Plaintiff Schmoll also testified that she was unaware of CR Nurses as a PA Nurse. *Id.*  Plaintiff Endsley admitted that she was unfamiliar with

---

[4] In fact, Plaintiff Grimmett generally disclaimed knowledge of *any* other nurse's duties: "I didn't pay that much attention as to who was coming in what time . . . I didn't have time to mind everybody else's business . . . I was in my—I was typing; looking at my computer. I wasn't minding what [other nurses] were doing . . . I don't know what [other nurses] did." *App. 4.*

medical management nurses who were not involved in preauthorization, had no knowledge regarding the duties of CR Nurses, and did not know of other nurses with different job titles performing the same job duties.  *Id.*  Finally, Plaintiff Clark testified that she did not know the job duties of CR Nurses.  *Id.*  In short, every single named Plaintiff disclaimed any knowledge of CR Nurses' job duties.

Opt-in plaintiffs who worked as CR Nurses had vastly different duties.  *App. 7.*  For example, Plaintiffs Jane Townsend, Rita Valdez, Angelita Cervantes, and Cordelia Garcia testified that as CR Nurses they would drive to different hospitals, meet with hospital staff, and review clinical information at nurses' stations in real time during the inpatient process to handle cases on-site.  *Id.*  Unlike the named Plaintiffs, Plaintiffs Townsend and Garcia often did not report to the office before heading to hospitals, whereas the PA Nurses largely performed their work in the office.  *Id.*  CR Nurses need to be able to quickly review medical records on-site and summarize the relevant highlights.  *Id.*  CR Nurses also testified that they did not have knowledge about and could not describe the duties, schedules, or hours worked by PA Nurses.  *Id.*

Nurses in other locations had different supervisors, different workloads, different types of work, and different work schedules.  *App. 8.*  The named Plaintiffs all worked only in the Austin, Texas office, yet purport to represent a class that worked at other Texas locations, including San Antonio, Corpus Christi, Lubbock, and Dallas.  *App. 9.*  Plaintiffs do not have knowledge of any relevant terms of employment for individuals at different offices at different times, let alone are capable of testifying that they are "similarly situated" to those individuals.

Even the broad subject matter of Plaintiffs' work differed considerably.  Plaintiff Schmoll worked exclusively with foster care (and applied those guidelines); others did not handle foster

care.   *App. 13*.   Plaintiff Ulrich was principally assigned work from a healthcare plan called "CHIP," while Plaintiff Endsley was principally assigned work from one specific provider.   *Id.* Some Plaintiffs were supervised by different managers.   *App. 14*.   Plaintiffs had different job titles and official job descriptions.   *App. 15*.   Plaintiffs even describe their own jobs differently, from why a nursing license was required to the amount of time they spent on the phone each day. *App. 16*.   For example, Plaintiff Clark stated that patient care experience was required, and Plaintiff Schmoll claimed that medical knowledge was necessary to know what to look for in the notes.   *Id.*   Plaintiff Grimmett, however, maintained that a nursing license was merely a regulatory requirement of the State of Texas.   *Id.*

Although one of the chief arguments by Plaintiffs in this action is that they are all similarly situated because they apply guidelines for utilization review, given the breadth of subject matter they were tasked with, Plaintiffs ultimately admitted that the guidelines they used and how they applied those guidelines differed considerably.   *App. 10*.   For example, in describing the order in which various guidelines were to be used, Plaintiff Clark said she was told to "start with the policy and procedures from Centene first and then InterQual and then TMHP," while Plaintiff Ulrich said "there were written instructions that for a certain kind of request you would use TMHP or for a certain kind of request you would use InterQual."   *Id.* Plaintiff Schmoll testified that "[m]ost of the time [she] used TMHP guidelines," and that she "never used InterQual for home health."   *App. 11*.   Plaintiff Endsley stated that she did not use InterQual at all until late in her employment, and Plaintiff Schmoll said she never used Centene's guidelines.   *Id.*   Yet, Plaintiff Angelita Cervantez testified that she was not permitted to use any other guidelines other than Interqual.   *Id.*

The guidelines referred to above differ considerably in the content and clinical

specialization required.  Centene's internal policies regarding Physical, Occupational and Speech Therapy Services requires examination by the PA Nurse of whether the individual "exhibits signs and symptoms of physical deterioration or impairment in…Cognitive/Psychological Ability [and] Cardiopulmonary Status."  *App. 12.*  Thus, the PA Nurse requires, *inter alia*, knowledge of what constitutes deterioration in cognitive/psychological abilities and cardiopulmonary status.  *Id.*  Other guidelines such as the Interqual guidelines regarding Acute Coronary Syndrome require much different clinical knowledge so as to decipher the myriad specialized terms and acronyms involved.[5]  Plaintiff Angelita Cervantez testified that it was her training as a nurse that allowed her to understand the Interqual guidelines covering "Acute OB – Antepartum."  *Id.*  Because the Texas regulations require quick turnarounds on authorization requests, each nurse must use specialized knowledge of that particular medical issue so that the request can be processed quickly.

With respect to the "overtime" alleged, there is not one representative story. Some Plaintiffs say they arrived early, others say they stayed late.  *App. 17.*  Some say they worked on Saturdays, others did not.  *App. 18.*  Some say they worked at home with a laptop, others did not work at home.  *App. 19.*  Some say they worked through lunch, others always took a lunch.  *App. 20.*  Some Plaintiffs claim they are owed compensation for travel time, while others are not.  *Id.* Depending upon their supervisor, some Plaintiffs allege they attended nurse meetings during the work day, others report they met after hours.  *App. 21.*  Plaintiffs allege as few as three hours of overtime per week, Plaintiff Ulrich claims he worked 18 hours of overtime each week, and

---

[5] For example, "[Unstable angina] is defined by ST segment depression or prominent T-wave inversion on ECG. Acute myocardial infarction (AMI) is defined as a detection of the rise and/or fall of cardiac biomarkers (troponin or CPK-MB) together with evidence of myocardial ischemia on ECG.  There are two types of AMI:
  • NSTEMI – ECG ST segment depression or T wave inversion and/or positive biomarkers in the absence of ST elevation
  • STEMI – ECG ST segment elevation and positive biomarkers  (*App. 12*).

Plaintiff Hartnagel claimed she worked 30 hours of overtime. *App. 22.* Some Plaintiffs also testified that they maintained a consistent number of hours worked beyond forty hours per week, while others noted that the hours worked beyond forty varied greatly. *App. 23.*

Additionally, several Plaintiffs were subject to discipline for attendance, *App. 24*, had widely differing attendance records, and varied use of paid time off, all of which would affect their weekly hours. *App. 25.* Plaintiff Ulrich also was disciplined with an unpaid suspension, and Plaintiff Clark admitted that she spent time not working while at work. *Id.* Plaintiff Pubien took FMLA leave for considerable periods of time from approximately March 2013 through May 2013, yet still claims he worked overtime and is entitled to damages during that period. *App. 28.*

Finally, certain Plaintiffs' performance reviews discuss their applied knowledge and expertise. For example, Plaintiff Jane Townsend's review notes she has "a keen power of analytical reasoning along with the ability to have original and independent thinking. Jane has demonstrated that she can carry a high volume of cases and meet TDI/NCQA guidelines. Jane not only identifies issues, Jane also provides solutions to issues." *App. 26.* Some Plaintiffs deny using any judgment or discretion, while others are adamant that they did apply judgment, skills, and experience in performing their job duties and applying the different guidelines. *App. 29.*

## IV.   <u>ARGUMENT</u>

### A.   The *Lusardi* Approach to Certification of FLSA Collective Actions

As this Court noted in the Conditional Certification Order, courts in the Fifth Circuit apply the method identified in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987), when evaluating FLSA collective actions. (Dkt. No. 62 at pp. 2-5). Given the Court's Conditional Certification Order, this action turns to the second stage of the *Lusardi* analysis. At the second stage, the Court makes a factual determination, with the benefit of discovery, about whether the claimants are in fact similarly situated to the prospective class. *Id.* at pp. 6-7. If not, the court

decertifies the conditional class.

This Court previously granted conditional certification to the putative class, but in doing so noted that some "nurses may have performed jobs too distinct from Plaintiffs to ultimately proceed to trial alongside them." *Id.* The Court should now apply the fact-based analysis of the second *Lusardi* stage and find that based on the facts collected in discovery, the putative class of Plaintiffs here are not similarly situated.

### B. The Putative Class Should Be Decertified Because Plaintiffs Have Failed to Establish That They Are Similarly Situated to The Proposed Class

The principal inquiry at the decertification stage is whether Plaintiffs are in fact similarly situated to the proposed class. *Harris v. Fee Transp. Servs., Inc.*, No. 3:05CV0077-P, 2006 WL 1994586, at *3 (N.D. Tex. May 15, 2006.) The courts consider three factors: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant that appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Id.* (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213 n.7 (5th Cir. 1995) (overruled on other grounds by *Desert Palace, Inc. v. Costa,* 539 U.S. 90 (2003)) and *Lusardi*, 118 F.R.D. at 359). "***Plaintiffs bear the burden of establishing that they are similarly situated to the proposed class.***" *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2004 WL 1497709, at *5 (E.D. La. July 2, 2004) (emphasis added).

Further, at the decertification stage, the Court applies a "stricter standard" in evaluating these factors. *Reyes v. Texas Ezpawn, LP*, No. V-03-128, 2007 WL 101808, at *2 (S.D. Tex. Jan. 8, 2007) (citing *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001) and *Mooney v. Arabian American Oil Co.*, No. H-87-498, 1993 WL 739661, at *8 (S.D. Tex. Aug. 25, 1993) (finding "due process concerns require the Court to scrutinize the opt-in plaintiffs and their respective claims with a more exacting eye to determine if they are in fact

'similarly situated'")).

Centene Texas has now collected compelling evidence that as to the material facts relevant to class certification, the Plaintiffs are not similarly situated so as to justify allowing the putative collective action to proceed to trial.[6]

### 1. Plaintiffs' Disparate Employment Situations Weigh Against Collective Treatment

The first *Lusardi* factor assesses differences between Plaintiffs and those they wish to represent in key aspects of employment, including job duties, geographic location, supervision, salary, department, tenure, employment history, and education. *See, e.g., Reyes*, 2007 WL 101808, at *2; *Mooney*, 54 F.3d at 1214. The evidence establishes that Plaintiffs do not merely have "[s]ome day-to-day variation in how and when [they] performed" their work, *Prater v. Commerce Equities Mgmt. Co.*, No. H-07-2349, 2007 WL 4146714, at *6 (S.D. Tex. Nov. 19, 2007), but are dissimilar in the material aspects identified in *Reyes*.

As detailed above, the various Plaintiffs---purported class representatives and opt-in plaintiffs alike---have no knowledge about other offices, other nurses, other jobs, others' job duties, or others' hours of work.  In particular, PA Nurses could not describe any details about the duties or circumstances of CR Nurses, and CR Nurses could not detail PA Nurse activities. There is also no suggestion that these jobs are actually the same. CR Nurses all visited different hospitals (and managed cases at different numbers of hospitals).  Some spent most of their time working in hospitals, while others primarily worked out of an office or their home.  The workloads and work schedules of each of the named and opt-in Plaintiffs are too disparate to identify significant similarity to maintain collective action certification.  Inclusion of individuals in disparate offices, even within one state, involves numerous significant factual differences.

---

[6] Centene Texas has simultaneously filed a Motion for Summary Judgment.  That Motion relies on different and conclusive material facts that warrant the application of the exemption to these Plaintiffs.

*Johnson v. TGF Precision Haircutters, Inc.*, No. H-03-3641, 2005 WL 1994286, at *2 (S.D. Tex. Aug. 17, 2005).

In *Reyes*, as in the instant case, plaintiffs alleged they were similarly situated because they spent the majority of their time performing standardized, non-exempt tasks. *Reyes*, 2007 WL 101808, at *2. The court held, however, that the plaintiffs' deposition testimony revealed significant differences in their job duties, and that ***a common job title among the plaintiffs, and even the fact that they may have spent the majority of their time performing non-exempt tasks, "does not establish sufficient similarities to warrant class certification." Id.*** (emphasis added). The court reasoned that, "[a]lthough the [plaintiffs] held the same job title, this fact alone does not necessarily mean they performed the same work." *Id.* at *4; *see also Morisky v. Pub. Serv. and Gas Co.*, 111 F. Supp. 2d 493, 498-99 (D.N.J. 2000). Ultimately, the court found that "other than the global allegations . . . that the FLSA was violated, that they [all had the same job title for the defendant] at one point, and that they primarily performed non-exempt work, there [was] no real commonality among the Plaintiffs in their actual day to day job duties." *Reyes,* 2007 WL 101808, at *4.

While Plaintiffs will likely depict their employment as involving "the same 'standardized' non-exempt tasks," their job titles and alleged performance of non-exempt tasks alone do not justify continued certification. *Reyes*, 2007 WL 101808, at *2. Unlike *Reyes*, the named Plaintiffs here do not share even the same job title as the majority of the putative class: all named Plaintiffs were PA Nurses while 20 members of the opt-in class worked as CR Nurses with wholly different duties and job settings. *App. 2.* It is inconceivable that the named Plaintiffs can proceed as class representatives when their testimony establishes that not only are their duties entirely dissimilar to CR Nurses, ***but they do not even know CR Nurses' job duties.***

*See Persin v. CareerBuilder, LLC*, 05 C 2347, 2005 WL 3159684, at *3 (N.D. Ill. Nov. 23, 2005) (noting that where a named plaintiff could provide "no recitation of knowledge that others in the company performed duties similar to his," conditional certification was inappropriate).

The Plaintiffs are not even similarly situated within the definition provided by the Court's Conditional Certification Order of those individuals who "applied pre-determined criteria and guidelines to a patient's medical data."  As set forth above in detail, Plaintiffs testified that they differ in which guidelines they used and how they applied those guidelines.  *App. 10-12.* Plaintiffs' stories as to the alleged "overtime" worked also differ so much as to be entirely inconsistent.  *App. 17-23.*  In short, Plaintiffs' experiences are so varied that they cannot be considered "similarly situated" and are not appropriate to present to a jury together at trial.

In addition to *Reyes*, considerable precedent from this Circuit dictates that decertification is appropriate here because of the disparate facts provided by Plaintiffs.  In *Mooney v. Aramco Services Co.*, the Fifth Circuit evaluated whether a district court's decertification of an opt-in collective action under the Age Discrimination in Employment Act ("ADEA") was appropriate. 54 F.3d 1207, 1212 (5th Cir. 1995).  Applying *Lusardi* and its progeny, the Fifth Circuit found that the plaintiffs there were not similarly situated, as they worked in different divisions, with different job titles, qualifications, education, and work locations.  *Id.* at 1214.  In short, "[o]ther than the global allegations of Plaintiffs that the ADEA was violated, that they were formerly Aramco employees, and that they were in the protected group over forty, ***there is no real commonality among the named Plaintiffs and the "opt-in" group.***"  *Id.* at 1215 (emphasis added).  Reviewing the record, the Fifth Circuit upheld the district court's determination to decertify the collective action claims.

Other federal district courts in Texas have reached similar results.  *See, e.g., Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 279 (N.D. Tex 2008), (convenience store hourly workers alleged that the employer required employees to work off-the-clock after completing forty hours of work per week.)  In *Proctor*, after significant discovery, the defendants moved to decertify the plaintiff class.  Noting that ***the burden is on the plaintiffs*** to prove that the individual class members are similarly situated, the Court applied the stringent standard and found that decertification was appropriate.  *Id.* at 280-81, 284.   The Court stated that "[d]ecertification is proper if 'the action relates to specific circumstances personal to the plaintiff rather than any generally applicable policy or practice,'" and noted that the court would need to be able to "'coherently manage the class in a manner that will not prejudice any party.'"  *Id.* at 280-81 (quoting *Burt v. Manville Sales Corp.*, 116 F.R.D. 276, 277 (D. Colo. 1987) and *Johnson*, 2005 WL 1994286, at *7).  "If there is 'no single decision, policy, or plan' that affects the Plaintiffs, the case will have 'enormous manageability problems….'"  *Id.* (quoting *Johnson*, 2005 WL 1994286, at *7).

Here, Plaintiffs cannot show any single decision, policy, or plan that governs their employment as a collective action, and instead have merely offered a hodgepodge of allegations that they should have been paid overtime.  The varied categories of nurses, duties, daily activities, workplaces, guidelines, and supervisors among the Plaintiffs makes a standardized examination of their claims extraordinarily difficult, emphasizing the need for decertification.  In particular, the *Proctor* court noted that the plaintiffs' claims varied "from store to store and manager to manager," and also "the times they allege they worked off the clock."  *Id.* at 283.  Because, as here, "there is no consistency among the testimony," the court decertified the collective action in *Proctor*.  *See also Faust v. Comcast Cable Commc'ns Mgmt., LLC*, No.

WMN-10-2336, 2014 WL 3534008, at *9 (D. Md. July 15, 2014) ("Commonality requires that class members "suffered the same injury." "Their claims must depend upon a common contention ... of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.") (quoting *Wal–Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2550–51 (2011)).

Similarly, the court in *Johnson* decertified a collective action where the plaintiffs worked at "separate locations under separate management with varying policies and working conditions." *Johnson*, 2005 WL 1994286, at *2. Notably, the 90 separate locations where the plaintiffs worked were all located in Texas, principally in the Houston, Austin, and San Antonio metropolitan areas. *Id.* Based on the great variation of the employees' circumstances (and the great variation of available defenses, discussed in more detail below), the *Johnson* court found decertification was appropriate. *Id.* at *8.

Further, in *Harris v. Fee Transp. Servs., Inc.*, the plaintiffs (who claimed they were all "customer service representatives") alleged they were similarly situated despite different job titles and job responsibilities. Yet, the court found "little similarity between the plaintiffs other than the fact that they all worked for the same employer and all claim violations of the FLSA." *Harris*, 2006 WL 1994586, at *3. In particular, the court noted that plaintiffs had significantly different degrees of contact with customers and brokers, as well as varied job duties. *Id.* at *3.

Finally, another court that has examined certification of utilization review nurses in the FLSA context and found that a comparable hodgepodge collection of nurses were not similarly situated. In *Ruggles v. Wellpoint, Inc.*, the court denied certification for a class[7] of "utilization

---

[7] In addition to the FLSA claims, the motions at issue in *Ruggles* concerned certification of a Rule 23 class for state law claims under statutes that paralleled the FLSA overtime provisions.

review nurses, case management nurses, and medical management nurses." 272 F.R.D. 320, 327 (N.D.N.Y. 2011). The plaintiffs in *Ruggles* suggested that for purposes of evaluating shared class characteristics, their primary duties consisted of "utilization reviews consist[ing] of collecting medical information (either by telephone, fax, email, or other means) that a hospital or healthcare provider has gathered about an insured to assist in authorizing requests for certain health insurance benefits." *Id.* at 332. The court rejected this characterization, however, agreeing with the defendant's contention that this definition was an oversimplification of the nurses' varying job duties. *Id.* at 332, 339-40.

Specifically, the *Ruggles* defendant presented evidence that the nurses' duties varied in the following ways: the nurses' caseloads; the types of reviews performed; whether the nurse interacts with policy holders or providers; the type and extent of such interaction; reviewing and/or editing WellPoint policies; conducting acuity assessments to determine eligibility; preparing specific case plans; scheduling other nurses; or reviewing performance. *Id.* at 332, n.8. Assessing the proposed class, the *Ruggles* court found that the differences between the plaintiffs precluded proceeding as a class. *Id.* at 339-40. The court relied in part on the fact that the nurses admitted to using different guidelines "in different combinations and consult them with varying frequency depending on the work each performs. *Id.* at 340. "Moreover, ***even if all nurses in the proposed class used the Milliman Guidelines, this would not dispense with the need for individualized inquiries.***" *Id.* (emphasis added).

Because the defendant in *Ruggles* argued for the applicability of the professional exemption, the court found that the critical considerations were "what activities a nurse engages in, whether such work requires advanced knowledge in a field of science or learning, what guidelines or tools a nurse employs, how often she consults them, and in what manner she does

so." *Id.* at 339.   Concluding that the job descriptions and deposition testimony indicated "varying levels of complexity in work performed by different grade nurses," the plaintiffs could not maintain a class action because "individual issues predominate." *Id.* at 340-41.

Similarly, the evidence here shows that Plaintiffs actually have wide and varied work settings, use or application of varying guidelines, and contact with hospital personnel and patients.   At trial, the examination of the guidelines used by each Plaintiff, whether Centene's Physical, Occupational and Speech Therapy Services guidelines, the Interqual guidelines on Acute Coronary Syndrome, or the Interqual Guidelines regarding Acute OB – Antepartum would require a completely individualized assessment for each nurse. *See App. 13*.   Plaintiffs are not similarly situated, and this action should be decertified.

### 2.   Centene Texas Raises Defenses That Are Individual to Various Plaintiffs

The second factor for evaluating decertification assesses "whether the potential defenses pertain to the opt-in class as a whole or whether many different defenses will be raised with respect to each individual plaintiff." *Reyes*, 2007 WL 101808, at *5.   "Because individualized defenses prevent an efficient proceeding with a representative class, several courts have granted motions for decertification on this basis." *Id.*   Centene Texas' defenses require individual analysis, making collective treatment inefficient, impractical, and prejudicial to Centene Texas.

### a.   Applicability of Exemptions Requires Individual Analysis

"[W]hat [P]laintiffs are really challenging here is [the] determination that they are exempt under the FLSA." *Morisky*, 111 F.Supp.2d at 498.   In its defense, Centene Texas has asserted the professional exemption, the administrative exemption, or a combination of both exemptions.[8]

---

[8] *See* Centene Texas' Motion for Summary Judgment, filed contemporaneously with the Court. By filing its Motion for Summary Judgment, Centene Texas does not suggest that this action meets the stringent criteria to be maintained on a collective basis.   While this is a nuanced distinction, it is a meaningful legal distinction. In the Motion for Summary Judgment, Centene Texas points to undisputed material facts which are applicable to each Plaintiff

Each Plaintiff may fall under one or more exemptions, particularly because Plaintiffs are nurses and RNs generally qualify for the professional exemption.[9]  29 C.F.R. § 541.301(e)(2).

Centene Texas has provided the Court with compelling information regarding the applicability of the exemptions that transcend the individual job duties of the plaintiffs. However, to the extent that Plaintiffs argue that individual analyses are necessary to assess the applicability of an exemption, that will serve to defeat a collective action.  In particular, Plaintiffs may argue that the finder of fact will need to evaluate the specific job duties of each Plaintiff, the level of knowledge each applies in his/her position, the discretion and judgment used, time spent speaking with physician providers, and training required.  *See* 29 C.F.R. §§ 541.200; 541.203; 541.300-541.301.   The exemption defense weighs heavily against collective treatment, and courts "refuse to certify a class…when determining whether the employer improperly treated the plaintiffs as nonexempt would require a highly individualized, fact-intensive inquiry."  *Aguirre v. SBC Commc'ns, Inc.*, No. H-05-3198, 2006 WL 964554 (S.D. Tex. Apr. 11, 2006).

"The exempt or non-exempt status of any particular employee must be determined on the basis of whether his duties, responsibilities, and salary meet all the requirements of the appropriate exemptions criteria."  *Reyes*, 2007 WL 101808, at *5. "The relevant statutory exemption criteria will require an individual, fact-specific analysis of each [plaintiff's] job responsibilities."  *Id.*  "Determining whether an employee's duty is administrative," for example, "is extremely individual and fact-intensive, requiring a detailed analysis of the time spent performing administrative duties and a careful factual analysis of the full range of the

---

regardless of location, job duties, or schedules.  Despite the application of these global facts to the law, if the Court does not grant summary judgment, the case will then necessarily devolve into disputes over other individualized non-global facts (such as the particular guidelines used by each Plaintiff and whether that guideline requires use of discretion and judgment), and this weighs against a collective action.

[9] Plaintiff Clark is an RN, as are many other nurses at Centene Texas, while Plaintiffs Ulrich, Endsley, Grimmett, and Schmoll are LVNs. *App. 30.*

employee's job duties and responsibilities." *Morisky*, 111 F.Supp.2d at 499. Further, "while some Plaintiffs may fall squarely within an exemption . . . , [the defendant] may have to use employment records and/or other contradictory witness testimony to rebut some of the Plaintiffs' allegations that they" do not fall within any exemption. *Reyes*, 2007 WL 101808, at *5. "The individual nature of the inquiry required make[s] collective treatment improper." *Morisky*, 111 F. Supp. 2d at 499.

If this Court does not grant Centene Texas' Motion for Summary Judgment based on some of the undisputed and global similarities of the Plaintiffs, the deposition testimony and documents submitted in support of that Motion and this Motion to Decertify would at least establish that the "proof required to establish these individualized § 7(i) exemption defenses would become the overwhelming focus of a trial which, to a jury or fact finder, would amount to trials [for all of the individual plaintiffs]." *Johnson*, 2005 WL 1994286, at *6. The purpose of collective action certification under the FLSA is to promote efficiency, but maintaining certification here would have the precise opposite effect. *Reyes*, 2007 WL 101808, at *6. Because Centene Texas' exemption defenses may be individualized to each Plaintiff's circumstances, the collective action should be decertified.

### b. Disciplinary and Performance Review Histories Are Unique to Each Individual

Additionally, several Plaintiffs were subject to discipline for attendance. *App. 26.* As in *Reyes*, these individualized facts negate Plaintiffs' claims that they worked overtime, or how much overtime they actually worked.[10] *See Reyes*, 2007 WL 101808, at *5. "These defenses [to damages] require individualized evidence, making it difficult for [Centene Texas] to defend all

---

[10] Centene Texas will also present widely differing attendance records in defense of Plaintiffs' claimed entitlement to overtime compensation, including the varied use of paid time off, Plaintiff Ulrich's unpaid suspension, Plaintiff Pubien's FMLA leave, and Plaintiff Clark's admission that she time spent not working while at work. *App. 25, 28.*

of Plaintiffs' claims with generalized proof." *Id.* Further, certain Plaintiffs agreed with statements in their performance reviews that reflected individualized assessments of their discretion, knowledge, and analysis. *App. 28.* For example, a performance review for Jane Townsend notes she has "a keen power of analytical reasoning along with the ability to have original and independent thinking. Jane has demonstrated that she can carry a high volume of cases and meet TDI/NCQA guidelines. Jane not only identifies issues, Jane also provides solutions to issues." *Id.* A trial of the collective action would necessarily devolve into an analysis of each individual's job duties, performance, and discipline, thus making continued collective action treatment inappropriate here.

### c.  The Statute of Limitations Bars Individual Claims Differently

Timeliness of the claim is also unique to each individual. Plaintiffs filed this lawsuit on February 22, 2012. Under 29 U.S.C. § 255(a), claims older than February 22, 2010 are untimely for Plaintiffs. Absent a determination of willfulness, for example, all of Plaintiff Schmoll's claims are time barred. Plaintiffs' time periods worked at Centene Texas vary widely. Consequently, the varied time periods worked by each Plaintiff supports decertification.

### 3.  Fairness and Procedural Considerations Weigh Against Collective Treatment

The final factor requires consideration of "the primary objectives of the FLSA § 216(b) collective action: (1) to lower costs to the plaintiffs through the pooling of resources, and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arise from the same alleged activity." *Reyes*, 2007 WL 101808, at *6 (citing *Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)). "The court must also consider whether it can coherently manage the class in a manner that will not prejudice any party or be particularly burdensome on a jury." *Id.* Like the factual differences and individualized defenses, fairness and procedural considerations also weigh heavily in favor of decertifying this class.

Litigating this case would be anything but efficient, as "the individual analysis each Plaintiff's claim will require," and "the judicial inefficiency of having essentially [a number of] mini-trials clearly outweighs any potential benefits in proceeding as a collective action." *Reyes*, 2007 WL 101808, at *6. "The Plaintiffs' claims are not amenable to generalized evidence and the Court would not be able to coherently manage the class without potentially prejudicing the parties." *Id.* The proof required to establish the individualized exemption defenses alone would become the overwhelming focus of a trial, which would amount to trials of many individual cases. *Johnson*, 2005 WL 1994286, at *6. The differences among the Plaintiffs and individualized, highly fact-intensive defenses, "would not only dominate but would swallow and consume the entire case."[11] *Reyes*, 2007 WL 101808, at *6; *Johnson*, 2005 WL 1994286, at *7.

V.   **CONCLUSION**

Because Plaintiffs cannot satisfy their burden to demonstrate that the members of the collective action are similarly situated to one another, Centene Texas respectfully requests that the Court decertify Plaintiffs' collective action claims, and grant such further relief as the Court deems just and proper.

---

[11] Moreover, individualized damage assessments, necessary because Plaintiffs have no evidence of hours worked by other nurses, would also militate against a collective action. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1428 (2013).

Respectfully Submitted,


BY: _____ */s/ Michael J. Gol*den _____
      Michael J. Golden
      State Bar No. 24032234

      BOULETTE & GOLDEN LLP
      2801 Via Fortuna, Suite 350
      Austin, TX 78746
      512.732.8902
      512.732.8905 (facsimile)
      mike@boulettegolden.com

      Robert A. Kaiser
      Jovita M. Foster
      Jeremy M. Brenner
      ARMSTRONG TEASDALE LLP
      7700 Forsyth Blvd., Suite 1800
      St. Louis, Missouri 63105
      314.621.5070
      314.621.5065 (facsimile)
      rkaiser@armstrongteasdale.com
      jfoster@armstrongteasdale.com
      jbrenner@armstrongteasdale.com

      ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been served upon all counsel of record on this 31st day of July 2014, as follows:

| | |
|---|---|
| David G. Langenfeld | Rachhana T. Srey |
| Dunham & Jones, P.C. | Nichols Kaster, PLLP |
| 1800 Guadalupe Street | 80 South 8th Street |
| Austin, Texas 78701 | Minneapolis, MN 55402 |
| 512.777.7777 (Telephone) | 612.256.3200 (Telephone) |
| 512.340.4051 (Facsimile) | 612.215.6870 (Facsimile) |
| david@dunhamlaw.com | srey@nka.com |
| | |
| *Via Hand Delivery* | *Via First Class U.S. Mail* |

      */s/ Michael J. Golden*
      Michael J. Golden
      Counsel for Defendants