**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

FILED

2014 SEP -3 AM 10: 50

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
          DEPUTY

KATHY CLARK, AMY ENDSLEY, SUSAN
GRIMMETT, MARGUERIETTE SCHMOLL,
and KEVIN ULRICH, on Behalf of Themselves
and All Others Similarly Situated,
                    **Plaintiffs,**

-vs-                                                    **Case No.  A-12-CA-174-SS**

CENTENE COMPANY OF TEXAS, L.P.,
                    **Defendant.**

_____

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and

specifically Defendant Centene Company of Texas, L.P.'s Motion for Summary Judgment [#110],

Plaintiffs Kathy Clark, Amy Endsley, Susan Grimmett, Margueriette Schmoll, and Kevin Ulrich's

Response [#122], and Centene's Reply [#125]; Centene's Motion to Decertify [#111], Plaintiffs'

Response [#119], and Centene's Reply [#124]; and Plaintiffs' Motion for Partial Summary Judgment

[#113], Centene's Response [#120], and Plaintiffs' Reply [#126]. Having reviewed the documents,

the governing law, and the file as a whole, the Court now enters the following opinion and orders.

### Background

This is an FLSA collective action brought by a number of utilization review nurses against

their employer, Centene Company of Texas, to recover unpaid overtime wages. Utilization review

consists of reviewing medical authorization requests submitted by healthcare providers to verify

"medical necessity" and the "appropriate level of care" for insurance coverage and payment



purposes. Plaintiffs are nurses who primarily perform utilization review, though their job titles vary. Nurses reviewing out-patient service requests are referred to as pre-certification, pre-authorization, or prior authorization (PA) nurses. Nurses reviewing in-patient service requests are referred to as concurrent review (CR) nurses. Nurses of both types are also more broadly referred to as Case Managers (CMs).

Plaintiffs are all nurses, but have varying degrees of education and hold different licenses and certifications. Among the different classifications are licensed practical nurses (LPNs), licensed vocational nurses (LVNs), and registered nurses (RNs).[1] In Texas, an LVN must complete an educational program approximately one-year in length and pass the NCLEX-PN licensing examination. *See* 22 TEX. ADMIN. CODE § 214.9(a)(1) (LVN program of study lasts "a minimum of 1,398 clock hours: 558 hours for classroom instruction and 840 hours for clinical practice"); *id.* § 217.4(a). An RN must complete an educational program between two and four years in length and pass the NCLEX-RN licensing examination. *See id.* § 215.9(a) (RN program of study lasts "at least the equivalent of two (2) academic years and shall not exceed four (4) calendar years"); *id.* § 217.4(a). Nurses of all types may also obtain four-year degrees (e.g., a Bachelor's of Science in Nursing), advanced degrees, and advanced certifications, and at least some CMs employed by Centene hold such qualifications. The baseline requirements to qualify for any CM job at Centene are: (1) licensure as an LPN, LVN, or RN, and (2) two or three years of clinical nursing experience.

This Court previously conditionally certified a class of utilization review nurses. The total number of plaintiffs, including the original five named plaintiffs, currently stands at thirty. Both sides

---

[1] LVNs and LPNs are essentially identical roles given different names by different state regulators. In Texas, the term LVN is used.

have now filed summary judgment motions on a handful of issues, though both motions focus heavily on Centene's alleged FLSA exemption defenses. Centene has also moved to decertify the class on the basis the twenty-five opt-in plaintiffs are not similarly situated to the named plaintiffs.

## Analysis

### I.     Motions for Summary Judgment

### A.     Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to

defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## B.    Application

### 1.    Exemption Defenses

Several classes of employees are statutorily exempt from the FLSA's overtime requirements. *See* 29 U.S.C. § 213 (listing exemption categories). "An employer claiming an exemption bears the burden of proving that the exemption claimed is valid." *Heidtman v. Cnty. of El Paso*, 171 F.3d 1038, 1042 (5th Cir. 1999). "Exemptions under the FLSA are construed narrowly against the employer, and the employer bears the burden to establish a claimed exemption." *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 471 (5th Cir. 2010). As the Fifth Circuit has explained, "the ultimate decision whether the employee is exempt from the FLSA's overtime compensation provisions is a

question[] of law." *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 331 (5th Cir. 2000); *see also Dalheim v. KDFW-TV*, 918 F.2d 1220, 1226 (5th Cir. 1990) (exemption determination, "though based on both historical fact and factual inferences, is properly characterized as a conclusion of law").

Centene claims Plaintiffs are exempt under at least one of three exemptions: (1) the learned professional exemption; (2) the administrative exemption; or (3) the combination exemption. The Court addresses each in turn.

a.     **Learned Professional Exemption**

The FLSA exempts from its overtime requirements "any employee employed in a bona fide . . . professional capacity." 29 U.S.C. § 213(a)(1). Department of Labor regulations further define which employees qualify for this "learned professional" exemption. The regulations explain:

> (a) To qualify for the learned professional exemption, an employee's primary duty must be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction. This primary duty test includes three elements:
>
> (1) The employee must perform work requiring advanced knowledge;
>
> (2) The advanced knowledge must be in a field of science or learning; and
>
> (3) The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction.

29 C.F.R. § 541.301(a).[2]

---

[2] In addition to satisfying this "primary duty test," exempt employees "must be compensated on a salary basis at a rate of not less than $455 per week." 29 C.F.R. § 541.500(a). It is undisputed Plaintiffs meet the salary requirement.

Plaintiffs first argue their work does not require "advanced knowledge . . . customarily acquired by a prolonged course of specialized instruction." *See id.* § 541.301(a)(3). The regulations contain a lengthy explanation of that phrase:

> The phrase "customarily acquired by a prolonged course of specialized instruction" restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession. The best prima facie evidence that an employee meets this requirement is the possession of the appropriate academic degree. However, the word "customarily" means that the exemption is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction. Thus, for example, the learned professional exemption is available to the occasional lawyer who has not gone to law school, or the occasional chemist who is not the possessor of a degree in chemistry. However, the learned professional exemption is not available for occupations that customarily may be performed with only the general knowledge acquired by an academic degree in any field, with knowledge acquired through an apprenticeship, or with training in the performance of routine mental, manual, mechanical or physical processes. The learned professional exemption also does not apply to occupations in which most employees have acquired their skill by experience rather than by advanced specialized intellectual instruction.

*Id.* § 541.301(d).

Nurses also receive special attention in the regulations:

> Registered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption. Licensed practical nurses and other similar health care employees, however, generally do not qualify as exempt learned professionals because possession of a specialized advanced academic degree is not a standard prerequisite for entry into such occupations.

*Id.* § 541.301(e)(2); *see also* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,153 (Apr. 23, 2004) (to be codified at 29 C.F.R. pt. 541) (hereinafter "Defining Exemptions") ("The Department's long-standing position is that RNs satisfy the duties test for exempt learned professionals, but LPNs do

-6-

not. As re-emphasized by the Administrator in an October 19, 1999 Opinion Letter, 'in virtually every case, licensed practical nurses cannot be considered exempt, bona fide, professionals.'" (citation omitted)).

The regulations make clear RNs are generally considered learned professionals, while LPNs (and, by extension, their functional equivalent in Texas, LVNs) are not. There is no dispute the CM position at Centene requires, at a minimum, only an LVN or LPN license and two or three years of practical experience. While RNs and nurses with more advanced degrees and certifications are also qualified for and hired for CM jobs, the Court's focus in analyzing the availability of the learned professional exemption is on the minimum requirements for the job. *See, e.g.*, *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 206 (2d Cir. 2009) ("If a job does *not* require knowledge customarily acquired by an advanced educational degree—as for example when many employees in the position have no more than a high school diploma—then, regardless of the duties performed, the employee is not an exempt professional under the FLSA."); *Dybach v. State of Fla. Dep't of Corrs.*, 942 F.2d 1562, 1565 (11th Cir. 1991) ("[T]he determinative factor is the job requirement and not the education in fact acquired by the employee."); *see also Kadden v. VisuaLex, LLC*, 910 F. Supp. 2d 523, 539–40 (S.D.N.Y. 2012) (holding graphics consultant with law degree was not an exempt learned professional where job did not require advanced legal training).

Centene contends this educational requirement is satisfied because all CMs must have something more than a high school diploma: they must have, at a minimum, attended some sort of nursing school program and obtained an LVN license. But *some* instruction beyond the high school level is not the same as "a prolonged course of specialized intellectual instruction." *See* 29 C.F.R. § 541.301(d). The regulations expressly state the "best prima facie evidence" the educational

requirement is met "is possession of the appropriate academic *degree*." *Id.* (emphasis added). LVNs do not necessarily hold any academic degree. The LVN program may be completed, and a license obtained, without earning any academic degree whatsoever. The Department of Labor historically treats LVNs as *non-exempt*, which is strong evidence the additional instruction LVNs receive beyond the high school level is insufficient to qualify them for the learned professional exemption. *See* Defining Exemptions, 69 Fed. Reg. at 22,153 ("LPNs and LVNs are not required to have an advanced degree or undergo a prolonged course of study in a recognized field of science or learning."); *see also Vela v. City of Hous.*, 276 F.3d 659, 675 (5th Cir. 2001) (holding paramedics and EMTs do not qualify as learned professionals because no "college degree" is required for the job, and course of study requiring "880 hours of specialized training" was insufficient to meet educational requirement).[3]

If nursing school[4] is insufficient standing alone, Centene argues its requirement CMs also possess two or three years of clinical experience shows its CMs are learned professionals. Although the regulations recognize the term "customarily" encompasses employees "who attained the advanced knowledge through a combination of work experience and intellectual instruction," LVNs

---

[3] The Department of Labor's historical treatment of LVNs and LPNs is not altered by Texas laws requiring certain healthcare workers to be "qualified to provide the requested service." *See* TEX. INS. CODE § 4201.252(b). Contrary to Centene's argument, this language does not "require[] Plaintiffs to have advanced knowledge," at least not as the FLSA and its implementing regulations use that phrase. Def.'s Mot. Summ. J. [#110], at 4. LVNs and LPNs are qualified to work directly with patients in a number of ways, but that has not historically made them learned professionals.

[4] Centene uses this generic phrase, "nursing school," to refer to the educational requirements imposed on CMs. But, as described in more detail above, RNs and LVNs attend different educational programs, though both may be called "nursing school." Further, some RNs may attend "nursing school" for two years and become licensed, while others may attend "nursing school" for four years and obtain a degree. Referring to all of these programs as "nursing school" masks substantial differences between the programs, and is at best a disingenuous characterization of Centene's actual job requirements.

do not fall within this caveat. *See* 29 C.F.R. § 541.301(d).[5] The regulations clarify the "customarily" language exists to capture, for example, "the occasional lawyer who has not gone to law school." *Id.* Most lawyers possess law degrees, and thus the rare practicing lawyer without such a degree exists as an outlier of presumably equal training operating in a field traditionally occupied by learned professionals.[6] Moreover, this caveat captures only those individuals who operate "in a field of science or learning where specialized academic training is a standard prerequisite for entrance into the profession." *Id.* While medicine is such a profession, not all persons working in the medical field are learned medical professionals. *See id.* ("Thus, the learned professional exemption is available for lawyers, doctors and engineers, but not for skilled tradespersons, technicians, beauticians or licensed practical nurses, *as none of these occupations require specialized academic training at the level intended by the regulations as a standard prerequisite for entrance into the profession.*" (emphasis added)). Finally, "[t]he learned professional exemption also does not apply to occupations in which *most employees have acquired their skill by experience rather than by advanced intellectual instruction.*" 29 C.F.R. § 541.301(d) (emphasis added). Because LVNs do not undergo

---

[5] *Pippins v. KPMG, LLP*, No. 13-889-CV, 2014 WL 3583899 (2d Cir. July 22, 2014), cited by Centene on this point, is inapposite. In *Pippins*, the Second Circuit held KPMG's audit associates qualified for the learned professional exemption. *Id.* at *14. The Court acknowledged the plaintiffs admitted "the vast majority of Audit Associates had accounting degrees and were eligible to take the CPA exam." *Id.* at *13 (internal quotation marks omitted). The Court therefore rejected the argument KPMG's hiring of a single, non-degree-holding audit associate showed audit associates as a class lacked advanced accounting knowledge. *Id.* at *14. As the Second Circuit explained, "the critical inquiry is not whether there might be a single Audit Associate who does not satisfy a specific set of academic requirements, but whether the 'vast majority' of Audit Associates required a prolonged, specialized education to fulfill their role as accountants." *Id.* Here, the evidence does not establish the "vast majority" of CMs hired by Centene received "a prolonged, specialized education." *Id.* To the contrary, all five of the named plaintiffs are LVNs, as are eleven of the thirty total Plaintiffs.

[6] *See* Defining Exemptions, 69 Fed. Reg. at 22,150 ("Characteristically, the members of the [legal] profession are graduates of law schools, but some few of their fellow professionals whose status is equal to theirs, whose attainments are the same, and whose word is the same did not enjoy that opportunity. Such persons are not barred from the exemption.").

the kind of advanced instruction contemplated by the exemption, the advanced knowledge they bring to the CM position is primarily a result of their clinical experience. The learned professional exemption was not intended to cover such employees. *See* Defining Exemptions, 69 Fed. Reg. at 22,153 ("The Department further clarifies that LPNs and other similar health care employees generally do not qualify as exempt learned professionals, *regardless of work experience and training*, because possession of a specialized advanced academic degree is not a standard prerequisite for entry into such occupations." (emphasis added)).

Construing the learned professional exemption strictly against Centene, as the Court is required to do, the summary judgment record establishes Plaintiffs are not qualified for the learned professional exemption. Plaintiffs do not satisfy the educational requirement to invoke the exemption because it is undisputed an employee is qualified to work as a CM with only an LVN or LPN license and two or three years of clinical experience. LVN and LPNs have historically not been treated as exempt because the education required to obtain an LVN or LPN license does not meet the level of education expected by the FLSA and its implementing regulations. Even though many Plaintiffs are RNs and hold advanced degrees and certificates, the CM job does not *require* those advanced qualifications. Because the CM job does not satisfy the education requirement, the Court need not address the parties' arguments concerning the other prongs of the primary duty test. The Court therefore DENIES Centene's motion for summary judgment and GRANTS Plaintiffs' motion for summary judgment on this exemption defense.

b.     **Administrative Exemption**

The FLSA also exempts from its overtime requirements "any employee employed in a bona

fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1). Like the learned professional

exemption, this administrative exemption is fleshed out in the regulations:

> The term "employee employed in a bona fide administrative capacity" in section
> 13(a)(1) of the Act shall mean any employee:
>
>> (1) Compensated on a salary or fee basis at a rate of not less than $455 per
>> week . . . ;
>>
>> (2) Whose primary duty is the performance of office or non-manual work
>> directly related to the management or general business operations of the
>> employer or the employer's customers; and
>>
>> (3) Whose primary duty includes the exercise of discretion and independent
>> judgment with respect to matters of significance.

29 C.F.R. § 541.200(a). Plaintiffs again concede the salary requirement is satisfied in this case, but

contest both the second and third prongs.

The second prong requires an employee to primarily perform office work[7] "directly related

to the management or general business operations of the employer or the employer's customers." *Id.*

§ 541.200(a)(2). The regulations further define this phrase, explaining a qualifying employee "must

perform work directly related to assisting with the running or servicing of the business, as

distinguished, for example, from working on a manufacturing production line or selling a product

in a retail or service establishment." *Id.* § 541.201(a). This kind of work includes, but is not limited

to:

> work in functional areas such as tax; finance; accounting; budgeting; auditing;
> insurance; quality control; purchasing; procurement; advertising; marketing;
> research; safety and health; personnel management; human resources; employee

---

[7] There is no dispute Plaintiffs' work qualifies as "office or non-manual work."

benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

*Id.* § 541.201(b).

Courts analyzing this prong of the administrative exemption test often use "the so-called 'production versus staff' dichotomy." Defining Exemptions, 69 Fed. Reg. at 22,140. While perhaps a bit archaic, this dichotomy attempts to distinguish "between those employees whose primary duty is administering the business affairs of the enterprise from those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market." *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230 (5th Cir. 1990). The Department of Labor treats this dichotomy as "illustrative—but not dispositive—of exempt status." Defining Exemptions, 69 Fed. Reg. at 22,141. Plaintiffs contend they fall on the production side of this divide, operating as the "worker bees" of the company. Centene insists Plaintiffs are more like administrative staff, not production-line workers.

The summary judgment record establishes Plaintiffs' jobs are more "production" than "administration." While it is somewhat difficult to determine precisely what Centene's "product" is from the parties' truncated descriptions, Centene self-describes its business as "administering government sponsored health insurance plans." Def.'s Mot. Summ. J. [#110], at 17. The role of the CM in this process is to analyze claims for payment, determine whether the requested procedure is medically necessary and appropriate, and either authorize payment or recommend denial of payment. This is a core functionality of Centene's business model, and is also essentially unique to Centene's niche industry. Plaintiffs are not accountants or compliance officers or human resource managers whose job descriptions could encompass jobs in any number of industries. *See* 29 C.F.R.

-12-

§ 541.201(b). Instead, Plaintiffs are uniquely positioned to "produce" Centene's "product"—in this case, the service of administering Medicaid claims. If Plaintiffs are administrative employees, it is difficult to conceptualize who within the Centene organization is *not* an administrative employee.

Centene's exemption argument rests primarily on a substantial number of cases and supporting authorities holding insurance claims adjusters qualify for the exemption because they perform "work directly related to the . . . general business operations" of the insurance company. *See, e.g.*, *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585 (5th Cir. 2006) (holding claims adjusters' duties "constitute Allstate's administrative operations"); 29 C.F.R. § 541.203(a) ("Insurance claims adjusters generally meet the duties requirements for the administrative exemption . . . ."). These cases are distinguishable in two ways.

First, insurance claims adjusters work for insurance companies. Those insurance companies write and sell insurance policies. As the Fifth Circuit had noted, "[a]n insurance company's product is its policies, and [claims adjusters'] duties [do] not include writing and selling insurance." *Cheatham*, 465 F.3d at 585. The Fifth Circuit therefore concluded, as have courts in many other circuits, that claims adjusting is an administrative task within the insurance company's business. Centene is distinct because it is not an insurance company and does not sell insurance policies. The product it produces is the service of administering Medicaid claims for the State of Texas. Plaintiffs are directly involved in the production and provision of that service, unlike claims adjusters who process claims made under their employers' insurance products. *See Dalheim*, 918 F.2d at 1230 ("production" side of dichotomy includes "those whose primary duty is producing the . . . services[] that the enterprise exists to produce and market"); *see also Bratt v. Cnty. of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir. 1990) ("The district court correctly captured the essence of [the "directly related

to management policies or general business operations"] requirement by interpreting it to mean 'the running of a business, and not merely . . . the day-to-day carrying out of its affairs.'").

Second, Plaintiffs' duties are largely distinct from those of an insurance claims adjuster. *See Cheatham*, 465 F.3d at 585 ("[A]s insurance company adjusters, Appellants advised the management, represented Allstate, and negotiated on Allstate's behalf; these duties are administrative in nature."); *id.* at 586 (insurance adjusters' duties included "determining coverage, conducting investigations, determining liability and assigning of fault to parties, evaluating bodily injuries, [and] negotiating a final settlement"); *see also In re Farmers Ins. Exchange, Claims Representatives' Overtime Pay Litig.*, 481 F.3d 1119, 1129 (9th Cir. 2006). The Department of Labor's regulations acknowledge insurance claims adjuster are "generally" exempt, so long as "their duties include activities such as interviewing insureds, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation." 29 C.F.R. § 541.203(a). Other than "evaluating and making recommendations regarding coverage of claims," CMs do not perform these roles. CMs review patient information and evaluate requested services using various industry payment guidelines. Based on the summary judgment record before the Court, CMs appear to occupy a distinct and separate niche from that of the insurance claims adjuster. *See Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d 856, 873 (C.D. Cal. 2012) (holding RN case manager of workers compensation claims was not administratively exempt under state-law analogue to FLSA because case manager's duties were "far from questions affecting management or the general business operations of the business").

-14-

Centene also contends CMs are administratively exempt because they perform administrative duties for Centene's customer, the State of Texas, by analyzing claims for payment under Medicaid. *See Withrow v. Sedgwick Claims Mgmt. Serv., Inc.*, 841 F. Supp. 2d 972, 979–80 (S.D.W. Va. 2012) (holding plaintiff claim examiners satisfied "directly related to business operations" prong because examiners "administered [state workers compensation] claims, rather than produced or sold a product"); *see also Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 872 (7th Cir. 2008) (holding auto insurance claims adjusters were administratively exempt even when they act as third-party claims adjusters for employer's customers). Both *Withrow* and *Roe-Midgett* are distinguishable because those cases involved classic insurance claims adjusters, employees who are generally accepted as administrative employees. Thus the distinction between in-house claims adjusting and outsourced claims adjusting was unpersuasive. *See Roe-Midgett*, 512 F.3d at 872 ("CCS's customers are insurance companies in the business of selling policies, and employees who process claims against those policies are performing an administrative function for CCS's customers (i.e., a task that administers the policies 'produced' by the insurers)."). CMs are not identical to claims adjusters, as discussed above. *See id.* at 871 ("[Claims adjusters] are at the front lines of CCS's auto claims adjusting operation; they spend most of their time in the field and represent the 'face' of CCS to the claimants and mechanics with whom they interact.").

Insurance claims adjusters have a special place in FLSA jurisprudence, as shown by the prominent placement of insurance claims adjusters as the first example in the regulations of employees who are generally administratively exempt. *See* 29 C.F.R. § 541.203(a). This special treatment no doubt explains many of the cases holding claims adjusters exempt. But more broadly, the administrative exemption is designed to apply to employees "performing general administrative

work applicable to the running of any business" rather than "employees directly producing the good or service that is the primary output of a business." *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 535 (2d Cir. 2009). Employees involved in carrying out the day-to-day business operations of a company are in the latter category, not the former. *See id.* at 536 (collecting cases so holding); *see also Neary v. Metro. Prop. & Cas. Ins. Co.*, 517 F. Supp. 2d 606, 614 (D. Conn. 2007) (§ 541.201(b) lists "duties clearly related to servicing the business itself . . . . Such are not activities that involve what the day-to-day business specifically sells or provides, rather these are tasks that every business must undertake in order to function."). Because the summary judgment record establishes CMs carry out the day-to-day business of Centene, allowing it to provide the service it charges its customers for, the Court DENIES Centene's motion for summary judgment and GRANTS Plaintiffs' motion for summary judgment on this exemption defense.[8]

**c.      Combination Exemption**

Centene makes a brief and conclusory alternative argument suggesting the "combination exemption" should apply if the Court rejects its arguments on both the learned professional and administrative exemptions. As the Fifth Circuit has explained it, the combination exemption applies "only where (1) an employee performs more than one type of work that would be exempt except that (2) neither type of work alone can be termed the employee's primary duty, but (3) all of the putatively exempt work taken together constitutes the employee's primary duty." *Dalheim*, 918 F.2d at 1232. In *Dalheim*, the Fifth Circuit held it was not error for the district court to refuse to consider the combination exemption because the district court had found the relevant employees "do *no*

---

[8] Because the Court concludes Plaintiffs do not meet the "directly related" test, the Court need not consider whether Plaintiffs also exercise discretion and independent judgment under the third prong of the administrative exemption test.

-16-

exempt work." *Id.* "Obviously, an employer cannot tack various nonexempt duties and hope to create an exemption." *Id.* Because the work constituting Plaintiffs' primary duty is not exempt under either the learned professional or administrative exemptions, there is no combination of exempt duties to tack together to fit within this exemption. Centene's motion for summary judgment is DENIED on this exemption defense.

**2.      Affirmative Defenses**

**a.      Section 259 Good Faith Defense**

"Section 10 of the Portal-to-Portal Act, 29 U.S.C. § 259, provides an employer with a complete defense to an FLSA proceeding when the employer has acted in good faith in conformity with a written administrative regulation, order, ruling, administrative practice or enforcement policy of the Secretary of Labor." *Brock v. El Paso Natural Gas Co.*, 826 F.2d 369, 374 n.8 (5th Cir. 1987); 29 U.S.C. § 259(a). Centene asserted the § 259 defense in its live Amended Answer, and identified via interrogatory answers a handful of authorities it allegedly relied upon: Texas state regulations, 29 C.F.R. § 541.301, and Section 22i36 of the Department of Labor's Field Operations Handbook. Plaintiffs contend there is insufficient evidence to establish Centene actually relied on any of these authorities, and the authorities are either irrelevant or too general to justify reliance.

At trial, Centene will of course bear the burden of proving its affirmative defense of good faith pursuant to § 259. Centene asserted via interrogatory answer it relied on the authorities identified above. Interrogatory answers are specifically listed among the types of competent summary judgment evidence in Rule 56. FED. R. CIV. P. 56(c)(1); *see also Celotex Corp.*, 477 U.S. at 324. Although this is a slim reed, it is sufficient to establish, for summary judgment purposes, Centene relied as it alleges. To Plaintiffs' second point, many of the authorities identified by Centene do not

-17-

qualify as proper materials for reliance under § 259. The FLSA regulation, and the Handbook section containing the same language, do qualify. *See Brock*, 826 F.2d at 374 n.8. On this record there are at the least factual disputes regarding the § 259 defense, and Plaintiffs' summary judgment motion is therefore DENIED on this ground.

b.      **Section 260 Good Faith Defense**

If an employer is ultimately found liable for violating the FLSA, the district court may decline or reduce any liquidated damages award "if the court concludes that the employer acted in 'good faith' and had 'reasonable grounds' to believe that its actions complied with the FLSA." *Singer v. City of Waco, Tex.*, 324 F.3d 813, 822–23 (5th Cir. 2003) (quoting 29 U.S.C. § 260). "[A]n employer faces a substantial burden of demonstrating good faith and a reasonable belief that its actions did not violate the FLSA." *Id.* at 823 (internal quotation marks omitted).

Plaintiffs contend Centene is not entitled to this defense because it cannot carry its substantial burden. Centene has provided some evidence it evaluated Plaintiffs' job duties and exempt statuses, and relied on federal regulations in making its decision. If Centene is ultimately held liable, it will be within this Court's discretion, based upon the evidence adduced at trial, to determine whether liquidated damages are appropriate. The Court will make the determination at that time, but not before. Plaintiffs' motion is DENIED on this ground.

c.      **Waiver**

If an employee agrees to settle a potential FLSA claim against his employer regarding the number or hours worked or his rate of pay, that settlement agreement will be treated as "an enforceable resolution of those FLSA claims" and will bar any future FLSA action over the same issue. *Martin v. Spring Break '83 Prods., L.L.C.*, 688 F.3d 247, 255 (5th Cir. 2012). Four plaintiffs

apparently signed releases and accepted payments upon leaving Centene. Although Centene asserted a waiver defense in its answer, Plaintiffs contend none of the four releases mentions a dispute over hours or pay, or the FLSA more broadly. Centene offers no response, and the Court therefore assumes any waiver defense is being waived. The Court GRANTS Plaintiffs' motion on this ground.

**d.     Laches and Estoppel**

"It is unclear whether the equitable defenses of waiver, estoppel, and laches are available under the FLSA." *Coffin v. Blessey Marine Servs., Inc.*, No. H-11-0214, 2011 WL 2193378, at *1 (S.D. Tex. June 6, 2011). Centene has asserted laches and estoppel defenses, and Plaintiffs argue they are entitled to summary judgment on both because neither is available under the FLSA. It is unclear what role a laches defense would serve given the FLSA's statute of limitations, but in any event, Centene does not offer any argument in support of its defense. The Court presumes it waived. With respect to estoppel, there are at least some circumstances where estoppel may be relevant in an FLSA case. *See Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1327 (5th Cir. 1972) ("On the narrow facts of this [FLSA] case, the court correctly granted a directed verdict on the basis that the appellant was estopped and could not profit from her own wrong in furnishing false data to the employer."). The Court will determine the availability and applicability of any estoppel defense based on the evidence presented at trial. Plaintiffs' motion for summary judgment is GRANTED as to the laches defense, but DENIED as to the estoppel defense.

**3.     Willfulness**

The statute of limitations for willful violations of the FLSA is three years; for all other violations, the statute of limitations is two years. 29 U.S.C. § 255. The willfulness standard under the FLSA requires the plaintiff to show "the employer either knew or showed reckless disregard for

the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1416 (5th Cir. 1990).

Centene argues there can be no finding of willfulness in this case, as a matter of law, because the evidence shows: (1) Centene worked with an affiliated management company to classify jobs as exempt or non-exempt based on job duties; (2) Centene consulted outside resources and worksheets when formulating its job descriptions; and (3) a supervisor testified no nurses ever complained to her about their exempt status. Plaintiffs argue there is evidence of willfulness, namely: (1) Centene stated via interrogatory it does not know who classified Plaintiffs' jobs as exempt, or when; (2) Centene relied on irrelevant materials in classifying Plaintiffs' jobs as exempt, including state law regulations and job description surveys for case managers with substantially different responsibilities than Plaintiffs; and (3) Centene relied on Department of Labor regulations which expressly state LPNs and LVNs are generally not exempt (namely, 29 C.F.R. § 541.301(e)(2)).

The Court concludes there are genuine factual disputes precluding summary judgment on the willfulness issue. Based on the evidence summarized above, reasonable jurors could conclude Centene at least acted recklessly in classifying Plaintiffs' jobs as non-exempt. Because the Court cannot say "no reasonable juror could find" for Plaintiffs on this issue, summary judgment is inappropriate. *Jenkins v. Methodist Hosps. of Dall., Inc.*, 478 F.3d 255, 260 (5th Cir. 2007).

## 4.    Individual Plaintiff Issues

Centene argues eight individual Plaintiffs should be dismissed. The Court addresses each in turn.

Plaintiff Norma Martinez apparently indicated to Plaintiffs' counsel she wished to withdraw from the class. Plaintiffs' counsel communicated that desire to Centene's counsel, and Martinez's deposition was canceled. The Court will therefore DISMISS Martinez from the suit.

The parties agree Plaintiffs Gabriel Mendiola and Christina Vaughn should be dismissed because their claims are time-barred even under the three-year statute of limitations. The Court therefore GRANTS Centene's motion for summary judgment on Mendiola and Vaughn's claims.

The evidence indicates Plaintiff Rose Guajardo was employed as a Prior Authorization Case Manager. Although Guajardo was apparently not a PA or CR nurse, it is unclear what exactly her job was and whether she is a proper class member. The Court declines to grant summary judgment on Guajardo's claims at this time because the evidence of her job title at least potentially places her within the class.

Centene contends Plaintiffs Cynthia Cantu, Cordelia Garcia, Sherri Hodsdon, and Margueriette Schmoll's claims are barred by the two-year statute of limitations. Because factual disputes regarding willfulness prevent a determination of the applicable statute of limitations at this point, Centene's motion is DENIED as to these plaintiffs.

## II.    Motion to Decertify

## A.    Legal Standard

The Fifth Circuit "has never set a legal standard for collective-action certification." *Roussell v. Brinker Int'l, Inc.*, 441 F. App'x 222, 226 (5th Cir. 2011) (unpublished) (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1216 (5th Cir. 1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)). As a result, district courts within the Fifth Circuit must choose

between two approaches: the *Lusardi* two-stage approach,[9] and the spurious class action approach. *Id.* This Court previously agreed with the parties and held the *Lusardi* approach was preferable in this case.

At the decertification stage of the *Lusardi* approach, the trial court's task is to determine whether the opt-in plaintiffs are similarly situated to the named plaintiffs. *Mooney*, 54 F.3d at 1214. Three factors are relevant to this determination: "'(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations.'" *Roussell*, 441 F. App'x at 226 (quoting *Mooney*, 54 F.3d at 1213 n.7).

**B.      Application**

Centene argues the Plaintiffs in this case are not similarly situated, devoting pages upon pages of briefing to identifying differences between them. At the same time, Centene moved for summary judgment on multiple exemption defenses, asserting *all* the plaintiffs, despite their apparent differences, are subject to the same exemptions. Having reviewed the parties' briefs and the sizeable summary judgment record, the Court concludes Centene has adeptly identified numerous differences between individual plaintiffs, but none so material as to prevent them from being similarly situated to one another.

**1.      Disparate Factual and Employment Settings**

Centene's first argument out of the gate suggests Plaintiffs cannot be similarly situated because PA nurses were not able to describe the job of CR nurses and vice versa. Centene contends the named Plaintiffs, all PA nurses, will therefore be unable to provide "representative testimony."

---

[9] *See Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987).

First, Centene identifies no authority prohibiting one or more CR nurse plaintiffs from testifying at trial. Second, the ultimate issue is whether the named plaintiffs are substantially similar to the opt-in plaintiffs, including the CR nurses. The evidence shows they are. Although CR nurses and PA nurses acquire their information differently—one by reviewing medical records from a remote computer, the other reviewing medical records on-site at the hospital—the core job duties are similar. Both classes of nurse must analyze medical records and patient data, compare the requested procedure to the applicable guideline, and either approve the procedure or recommend its denial. Though they may not know it because they did not work together, all Plaintiffs performed similar jobs.

Disagreeing with this conclusion, Centene also attempts to highlight salient differences between Plaintiffs' jobs which render this case unsuitable for collective resolution. For example, the Plaintiffs worked at different hospitals, in different cities, for different bosses; some worked from home; their workloads differed; and their individual schedules differed. These are legitimate differences, but Centene does not explain why they are material and preclude collective resolution of this case. *See Escobedo v. Dynasty Insulation, Inc.*, No. EP-08-CV-137-KC, 2009 WL 2382982, at *6 (W.D. Tex. July 31, 2009) (denying motion to decertify where identified differences between class plaintiffs did not "bear on the merits of their claims"). FLSA liability does not turn on the geographic location of a workplace or on the identity of a direct supervisor. Yet Centene contends such facts will inexplicably come to dominate the trial of this matter. The Court is unconvinced.

Though Centene will not admit it, Centene has already conceded the most fact-intensive liability defenses it has in this lawsuit—the learned professional exemption and the administrative exemption—can be decided as a matter of law *despite* the differences Centene identifies in its decertification motion. These positions are wholly inconsistent, and substantially undercut the force

-23-

of Centene's decertification argument. *See, e.g., Monroe v. FTS USA, LLC,* 763 F. Supp. 2d 979, 985 n.6 (W.D. Tenn. 2011) ("The Court agrees with Plaintiffs that Defendants' motion for summary judgment is in tension with their motion to decertify since one seeks to conclude the case on a classwide basis while the other argues that classwide adjudication is improper."); *Spoerle v. Kraft Foods Global, Inc.,* 253 F.R.D. 434, 439 (W.D. Wisc. 2008) ("[I]t is somewhat ironic that defendant is now arguing that it is impossible to determine liability on a class wide basis. After all, it was defendant that moved for summary judgment before almost any discovery had been conducted, arguing that it was possible to resolve the entire case as a matter of law without regard to the differences between the plaintiffs.").[10]

Centene's bravado in arguing Plaintiffs basically work thirty different jobs is particularly astounding in light of Centene's specific summary judgment arguments. For example, Centene has told the Court: (1) Plaintiffs all possess and apply advanced medical knowledge and skill; (2) Plaintiffs all perform utilization review, a process whereby they make assessments of medical necessity and decisions about plan coverage; (3) Plaintiffs are all required to interpret Centene policies and guidelines; (4) Plaintiffs all make "judgment calls" as part of their utilization reviews; (5) Plaintiffs were all audited to check their guideline-application performance against Centene's internal standards; (6) Plaintiffs all received similar instructions about exercising discretion and communicating with physicians; (7) Plaintiffs all substantially affected Centene's business by either approving claims or recommending claims for denial by a superior; (8) Plaintiffs all had "virtually

---

[10] Centene also appears convinced the only possible outcomes in this case are judgment as a matter of law for Centene on its exemption defenses, or trial focusing on Centene's exemption defenses. But Plaintiffs cross-moved for summary judgment on those defenses. The parties agree there are no factual issues, they simply disagree on the application of law to facts. Because the Court resolves the bulk of those cross-motions in Plaintiffs' favor, the trial will not be muddied by presentations about the applicability of defenses both parties agreed did not require a trial to resolve.

unchecked authority" to approve requests based on their applications of the guidelines; (9) Plaintiffs all advised management on policies and guidelines; and (10) Plaintiffs all operated without daily oversight. Yet despite these vast swaths of uniformity among Plaintiffs' job duties and daily responsibilities, Centene maintains each Plaintiff's position must be analyzed individually to determine liability and assess damages. *See, e.g.*, Def.'s Reply [#124], at 4 (referring generally to the above facts as "the few common denominators between Plaintiffs"). Hogwash.

The evidence of similarity in the record is substantial. Plaintiffs were all utilization review nurses who used some combination of three guidelines to analyze requests for medical services. Which particular guidelines were used by which Plaintiffs, or how often, is immaterial to liability and damages issues. All Plaintiffs could approve requests; none could deny requests, but instead were required to recommend denials to a superior. Plaintiffs were universally classified as exempt based not upon an individualized assessment of their specific job but by their formal job descriptions. *See* Pls.' Resp. [#119-4], Ex. C (deposition of Shelly Cattoor, Director of Compensation at Centene), at 51 (to determine exemption status, "We just look at it based on the job description, not the employees in the job"); *id.* at 48–50 (to determine exemption status, Centene did not conduct individual interviews or consider employee's location, manager, or job schedule). Centene used a third-party management company to make its exemption classification decisions on a position-wide basis, and reached the same conclusion for every CM nurse, be it PA or CR, RN or LVN, telecommuter or office worker, in Austin or Dallas or San Antonio. Plaintiffs claim they were universally required to work overtime because of a quota system requiring Plaintiffs to maintain a certain level of productivity. These facts tell thirty *substantially similar stories*, even if they are not identical. *See Plewinski v. Luby's Inc.*, No. H-07-3529, 2010 WL 1610121, at *6 (S.D. Tex. Apr. 21,

-25-

2010) (denying a motion to decertify a class of waiters who worked at different restaurant locations, for different managers, and had slightly different job responsibilities).

## 2.    Centene's Individualized Defenses

Centene argues it has raised three categories of individualized defenses which preclude collective treatment of the Plaintiffs in this case: (1) its exemption defenses; (2) evidence regarding disciplinary actions and performance reviews; and (3) the statute of limitations. None of these defenses serve as a barrier to class certification.

First, Centene should know its exemption defenses do not require individualized analysis: its own summary judgment motion argued *every Plaintiff* is exempt *regardless of individual differences*. Plaintiffs cross-moved for summary judgment, agreeing the undisputed facts are sufficient to resolve the applicability of the exemption defenses. The Court, having resolved those defenses adverse to Centene, has removed any possibility of individualized exemption defenses dominating the trial.

Second, Centene's evidence concerning how many overtime hours each Plaintiff worked is relevant only to damages, not liability, and therefore does not require decertification. In advancing its argument, Centene relies solely on a single district court opinion, which it then selectively quotes and substantively rewrites using editorial brackets. *See Reyes v. Tex. Ezpawn, L.P.*, No. V-03-128, 2007 WL 101808, at *5 (S.D. Tex. Jan. 8, 2007). Centene represents *Reyes* stands for the proposition that "'defenses [to damages] require individualized evidence, making it difficult for [Centene Texas] to defend all of Plaintiffs' claims with generalized proof.'" Def.'s Mot. Decertify [#111], at 18–19 (quoting *Reyes*, 2007 WL 101808, at *5). But *Reyes* was not talking about "defenses to damages," it was addressing the individualized nature of the *exemption defenses* raised in that case. 2007 WL

101808, at *5. Centene's evidence of the precise number overtime hours worked goes exclusively to damages, an issue not addressed by the *Reyes* court and generally found to be an insufficient basis for decertification. *See Metcalfe v. Revention, Inc.*, No. 4:10-CV-3515, 2012 WL 3930319, at *6 (S.D. Tex. Sept. 10, 2012) ("Whether individualized determinations are necessary to define the extent of Plaintiffs' damages, if any, does not weigh against efficiently establishing Defendants' class-wide liability."); *Maynor v. Dow Chem. Co.*, 671 F. Supp. 2d 902, 935 (S.D. Tex. 2009) ("The need for individual plaintiffs to establish the amount of uncompensated time does not defeat certification.").

Third, Centene's statute of limitations defense is easily resolved, especially because the affected employees' dates of employment are undisputed. Once a determination of willfulness is made, application of the appropriate two- or three-year statute to the relevant Plaintiffs will be a straightforward task.

### 3.    Fairness and Procedural Considerations

Centene also argues efficiency concerns militate against collective treatment, returning once again to its same exemption-defense arguments. As explained above, those concerns are now moot. Proceeding collectively always poses certain logistical challenges, and this case is no different in that regard. But the alternative—more than two dozen individual trials litigating largely the same liability issues and defenses—is less efficient, less expedient, and simply unnecessary.

The Court DENIES Centene's motion to decertify.

**Conclusion**

Accordingly,

IT IS ORDERED that Defendant Centene Company of Texas, L.P.'s Motion for Summary Judgment [#110] is GRANTED IN PART and DENIED IN PART, as stated in this opinion;

IT IS FURTHER ORDERED that Centene's Motion to Decertify [#111] is DENIED;

IT IS FINALLY ORDERED that Plaintiffs' Motion for Partial Summary Judgment [#113] is GRANTED IN PART and DENIED IN PART, as described in this opinion.

SIGNED this the 2nd day of September 2014.

SAM SPARKS
UNITED STATES DISTRICT JUDGE