IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2015 MAY 11  PM 3: 58

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
DEPUTY

KATHY CLARK, AMY ENDSLEY, SUSAN
GRIMMETT, MARGUERIETTE SCHMOLL,
and KEVIN ULRICH, on Behalf of Themselves
and All Others Similarly Situated,
                                         Plaintiffs,

-vs-                                                    Case No.  A-12-CA-174-SS

CENTENE COMPANY OF TEXAS, L.P.,
                                         Defendant.

_____

## O R D E R

BE IT REMEMBERED on the 2nd, 3rd, and 4th days of February, 2015, the Court held a

bench trial in the above-styled cause, and the parties appeared in person and through counsel.

During trial, the Court heard testimony from the following witnesses: Robin Lorie DeSalvo; Karen

Calabrese; Margueriette Schmoll; Rita Valdez; Cynthia Cantu; Cordelia Garcia; Shelly Cattoor;

Sherri Hodsdon; and Esmeralda Cazares-Baig.  At the close of Plaintiffs' evidence, Defendant

Centene Company of Texas, L.P. filed its Motion for Judgment on Partial Findings [#149] in open

court, which the Court carried.  Having considered the evidence and testimony presented at trial, the

arguments of counsel, the parties' briefs, and the governing law, the Court enters the following

findings of fact and conclusions of law.

### Background

This case is a Fair Labor Standards Act (FLSA) collective action to recover unpaid overtime

wages brought by Plaintiffs Kathy Clark, Amy Endsley, Susan Grimmett, Margueriette Schmoll, and

Kevin Ulrich, a group of utilization review nurses (URNs) formerly employed by Defendant Centene Company of Texas, L.P. (Centene). As Centene URNs, Plaintiffs were responsible for assessing medical authorization requests submitted by healthcare providers for purposes of insurance coverage and payment. There are two types of URNs: prior authorization nurses, who review outpatient service requests, and concurrent review nurses, who review inpatient service requests. Unlike prior authorization nurses, who typically work in the office, concurrent review nurses typically travel to hospitals and perform some on-site work, and both types of URNs can perform work from home. All URNs are responsible for the same basic tasks: reviewing medical authorization requests to determine whether a medical procedure requested by a healthcare provider is medically necessary. At Centene, URNs complete authorizations by entering their reviews into a computer program called "CCMS."

The Court conditionally certified the collective action on May 8, 2013. *See* Order of May 8, 2013 [#62]. Following discovery, Centene simultaneously moved to decertify and for summary judgment, *see* Mot. Summ. J. [#110]; Mot. Decertify [#111], and Plaintiffs cross-moved for partial summary judgment on liability, *see* Mot. Partial Summ. J. [#113-1]. In its motion to decertify, Centene argued Plaintiffs were not substantially similar to one another because they worked in different settings (some at home, some in the office, some in hospitals, some in a combination of the three), in different cities, and for different bosses, and because Plaintiffs' individual workloads and schedules varied. The Court found those differences did not bear on the merits of Plaintiffs' claims, particularly in light of the fact Centene sought summary disposition of the litigation by arguing all Plaintiffs possessed and applied medical knowledge, performed utilization review, interpreted Centene policies and guidelines, received similar instructions, worked without daily oversight, and

were performance-audited based upon Centene's internal standards. *Id.* at 24–25. The Court noted, in addition to the above, that Plaintiffs were universally classified as exempt based not upon an individualized assessment of their jobs, but rather, upon the formal Centene job descriptions that applied to all URNs. *Id.* at 25. Consequently, the Court denied Centene's motion to decertify.

Further, the Court granted summary judgment in favor of Plaintiffs as to liability, finding Centene improperly classified URNs as exempt from overtime under the FLSA. *See* Order of Sept. 2, 2014 [#127]. However, the Court found genuine issues of fact remained concerning (1) whether Centene willfully violated the FLSA, thereby extending the limitations period from two years to three, and (2) Centene's good-faith defenses under 29 U.S.C §§ 259 and 260. *See id.* The case therefore proceeded to bench trial on the issues of damages, willfulness, and good faith.

A.     **Summary of the Evidence**

Twenty-six (26) named and opt-in plaintiffs, who variously worked in Centene's Austin, Dallas, Corpus Christi, San Antonio, and Lubbock offices, were part of the litigation at the time of trial.[1] The parties stipulated to the cities of employment, dates of employment, types of reviews (concurrent or prior authorization) primarily performed, and consent filing dates for each of the twenty-six plaintiffs. In their case-in-chief, Plaintiffs called the following witnesses: adverse witness Robin Lorie DeSalvo, a former URN and former supervisor of URNs at Centene; six Plaintiffs—Karen Calabrese, Margueriette Schmoll, Rita Valdez, Cynthia Cantu, Cordelia Garcia, and Sherri Hodsdon; and adverse witness Shelly Cattoor, Centene's senior director of compensation. Following the close of Plaintiffs' case, Defendants called Esmeralda Cazares-Baig, Centene's senior

---

[1] Prior to trial, the action consisted of twenty-seven (27) plaintiffs. The parties stipulated before trial, however, that one of the plaintiffs, Rose Guajardo, is ineligible to bring a claim. *See* Stipulated Facts [#141] at 1 n.1. Accordingly, Plaintiff Rose Guajardo is hereby DISMISSED from this action.

vice president of complex care operations who previously worked as the vice president of medical management for utilization review, and then rested. Both parties also offered a number of documentary exhibits. A brief summary of the testimony presented by each witness and documentary evidence related to that testimony follows.

### 1. Robin Lorie DeSalvo

Robin Lorie DeSalvo worked for Centene as a supervisor of utilization management from January 2011 through October 2012. Prior to that time, DeSalvo worked as a URN.[2] In DeSalvo's role as a supervisor, her primary responsibility was to assess the productivity of URNs and ensure that in reviewing their assigned medical authorization requests, URNs stayed within "turn-around times," or TATs. TATs, DeSalvo explained, are mandated under Texas law and under National Committee for Quality Assurance (NCQA) standards for utilization management, and require a submitted authorization request be completed within a specified time frame. Centene can be fined if its URNs fail to meet TATs.

DeSalvo testified all Centene URNs are required to review forty authorization requests per day, no matter how long it takes them to do so. DeSalvo stated if URNs completed those requests, they could choose to take additional authorizations and continue working if they wanted to do so. DeSalvo also confirmed Centene had no mandatory timekeeping system for its URNs, and agreed URNs were not required to track their hours through CCMS. DeSalvo acknowledged during periods of time in which CCMS was down or experiencing technical problems, nurses were expected to keep working.

-----

[2] URNs are also called "Case Managers."

DeSalvo testified that in 2009, Centene had a large backlog of unreviewed authorization requests that required URNs to work extra hours.  During that year, DeSalvo worked as a URN alongside Plaintiff Margueriette Schmoll, and was supervised by Elizabeth England; according to DeSalvo, England required URNs to come into work on Saturdays. DeSalvo stated in 2010, Centene hired temporary workers to help address the backlog of authorizations.  As of 2011, DeSalvo testified the primary driver of overtime was TATs, and in 2012, the primary driver of overtime was Centene's expansion, which created a 50% increase in the workload borne by URNs.

When DeSalvo's tenure as a supervisor began in 2011, she mandated certain Saturdays, and also asked her URNs to work an additional hour each weekday, whether by coming in early, staying late, or working through lunch.  Further, DeSalvo noted certain mandatory nurses' meetings and mandatory training sessions were held after normal business hours or on Saturdays.  DeSalvo agreed Centene was "well aware" the heavy workload and overtime hours were issues "across the board, for all the nurses."

During direct examination by Plaintiffs, DeSalvo testified when she was a URN, she worked approximately 40 to 48 hours per week, and her coworkers worked approximately the same hours. On cross-examination by Centene, DeSalvo testified that other than during the Centene expansion, which occurred from March 2012 through June 2012, URNs worked approximately 40 hours per week.  Documentary evidence adduced by Plaintiffs, however, showed significant discussion of overtime which took place during 2009, 2010, 2011, and 2013. *See* Tr. Exs. P-56, P-58 (March 2009 emails discussing overtime and Saturday work due to 272-case backlog); P-67 (April 2009 emails discussing mandatory Saturdays on April 25th and May 2nd); P-73 (May 2009 email discussing "serious situation" created by outstanding authorizations and requesting URNs come in on Saturday);

P-77 (July 2009 email discussing backlog of 1,131 authorizations and mandating Saturday work); P-81, P-82, P-83 (August 2009 emails discussing mandatory Saturdays "until we get caught up" and truncated lunch hours); P-90 (November 2009 email discussing mandatory Saturday); P-96, P-97 (January 2010 emails discussing backlog and Saturday work); P-101 (September 2010 email discussing extra hour of work during weekdays); P-111, P-117 (May 2011 emails discussing backlog, mandatory Saturdays, and additional weekday hours); P-120, P-121 (June 2011 emails discussing mandatory Saturdays); P-150 (January 2013 email discussing short-staffing and long hours in Dallas office); P-151 (May 2013 email discussing long hours in Dallas office).

### 2.    Karen Calabrese

Plaintiff Karen Calabrese worked for Centene as a prior authorization URN from March 19, 2012, to December 7, 2012.  Calabrese worked in the Austin, Texas office with approximately fifteen to twenty other URNs. According to Calabrese, her average workday began at 7:30 a.m. and ended somewhere between 6:30 and 7:00 p.m. Calabrese testified she regularly ate lunch at her desk, and noted it was not uncommon for other URNs in her office to do the same.  Calabrese stated that two or three times per week, she would continue working from home after her workday ended, and estimated that she regularly worked an average of 60 hours from Monday through Friday.  Calabrese testified she worked approximately three Saturdays per month, typically for six hours per Saturday, and thus estimated her total average workweek, including Saturdays, at 63 hours.

According to Calabrese, even when she and other URNs completed their 40 assigned authorizations in a workday, more authorizations would be given, and management would require the new authorizations to be finished during that same day. Calabrese testified the workload required overtime during the duration of her employment with Centene, not just during the period of

Centene's expansion, and stated she complained about her hours to Robin Lorie DeSalvo and Deirdre Long-Coker, her two supervisors.

On cross-examination, Calabrese testified to the extent she was not logged on to the CCMS computer system during evenings and weekends, she was not doing work. Further, Calabrese acknowledged that in her interrogatories, she had estimated her average hours worked per week from between 57.5 to 63.5 hours, not 63 hours. With respect to her work performed on Saturdays, Centene questioned Calabrese regarding her 90-day evaluation form, in which her supervisor indicated Calabrese "worked 5 extra Saturdays after expansion"; Calabrese agreed that if she had worked three Saturdays per month while a Centene URN, she would have worked nine Saturdays during that 90-day period, not five.

### 3.   Margueriette Schmoll

Plaintiff Margueriette Schmoll worked for Centene as a prior authorization URN from August 11, 2008, to January 27, 2010. Schmoll worked in the Austin, Texas office and was supervised by Robin Lorie DeSalvo, Cheryl Slagers, and Elizabeth England. According to Schmoll, after she was hired, her hours were from 8:00 a.m. to 5:00 p.m. for approximately one month; following that month, her workload steadily increased, until she began taking only a half-hour lunch, working extra hours on the weekdays, and then, working on Saturdays. Schmoll testified during her tenure, the productivity target for URNs increased from 30 authorizations per day to 40 authorizations per day.

Schmoll stated her average workday began at 8:00 a.m. and ended at approximately 5:30 p.m. Schmoll took a half-hour lunch on most days, and continued working from home approximately two or three times per week for about two hours per night. During Monday through Friday, Schmoll

testified she worked an average of 50 hours per week. Schmoll explained her weekend work began as half-day Saturdays, then increased to full 8:00 a.m. to 5:00 p.m. Saturdays approximately every other Saturday, increasing her weekly average to 54 hours per week.

On cross-examination, Schmoll stated prior to Elizabeth England's term of supervision, which began approximately five months before Schmoll's employment with Centene ended, URNs were not required to take a half-hour lunch or work an extra hour in the office during the weekdays. Further, Schmoll testified she had not worked any Saturdays before England became her supervisor. Schmoll reiterated, however, that she worked overtime under all three of her supervisors, and the overtime hours required steadily increased over the duration of her employment.

### 4.    Rita Valdez

Plaintiff Rita Valdez was employed by Centene as a concurrent review URN from March 15, 2010, to August 10, 2012. Valdez worked in Corpus Christi, Texas and performed work in the office, at hospitals in the city, and at home. Valdez testified her typical workday would begin at the office at 7:30 a.m., and she would work until the lunch hour, when she would either take an hour's lunch right away or head to her assigned hospitals to conduct her on-site reviews, then take lunch when she was finished. Valdez testified she was assigned three hospitals and would typically spend approximately two hours at those hospitals. After finishing at the hospitals, Valdez testified she would go back to the office and work until 5:00 p.m., when she would leave to pick up her children from school. After picking up her children, she would work in the evening for approximately one-and-a-half hours. Valdez further stated she worked approximately two weekends per month from home, and when doing so, would put in a few hours' work. Valdez testified she worked an average of 50 to 52 hours in a typical work week. During cross-examination, Valdez agreed she gave a

higher number of hours in her previous answers to interrogatories, and admitted that higher number was not accurate.

According to Valdez, if she completed all of her assigned work, she would be assigned more work from different Centene offices, such as the San Antonio office or the office located in the Rio Grande Valley. Valdez testified she sometimes worked outside of the CCMS computer system by highlighting hard copies of paperwork so she would later be able to enter that information into CCMS very quickly. Further, Valdez testified she worked outside the CCMS system while making phone calls, sending emails, dealing with hospital case managers, gathering faxes, and doing on-site work at the hospitals.

### 5. Cynthia Cantu

Plaintiff Cynthia Cantu was employed by Centene as a concurrent review URN from June 30, 2008, to February 2, 2011. During her employment, she was supervised by Elizabeth England and Norma Lozano. Cantu worked in the Austin, Texas office, and performed work in the office and on-site at hospitals. Cantu testified her typical workday began in the office at approximately 7:00 a.m., when she would spend about an hour reviewing her calendar and task list and preparing to go to her assigned hospital. At the hospital, Cantu would obtain the information she needed and then head back to the office, where she preferred to work. Cantu testified she typically did not take a lunch, and instead, ate at her desk. According to Cantu, her typical workday ended between 6:00 and 6:30 p.m., although that could vary depending upon what was going on in the office—for example, whether there were trainings or nurses' meetings. Cantu further testified management required URNs to meet TATs, the duration of which changed from time to time, but in general, wanted URNs to "stay until your work is done" and have assigned work completed within 24 hours.

On cross-examination, Cantu testified that while she stated in her interrogatories that she worked an average of 60 hours per week (not 55, as would be supported by a typical 7:00 a.m. to 6:00 p.m., eleven-hour workday), it would not be fair to say she was merely guessing as to the number of hours she actually worked, because she remembered specific instances of being at the office past 8:00 p.m.

### 6.    Cordelia Garcia

Plaintiff Cordelia Garcia worked for Centene as a concurrent review URN from April 20, 2009, to August 26, 2010.  Garcia worked in Austin, Texas, and testified she primarily worked from home, although she would go into the office on Wednesdays.  According to Garcia, she took the job at Centene because she wanted an 8:00 a.m. to 5:00 p.m. schedule, but the job did not turn out to be an 8 to 5 job.  On a typical day, Garcia testified, she would travel to both of her assigned hospitals in the morning, obtain the data and patient information she needed, then return home and complete her work.  Garcia explained she would typically arrive at the first hospital around 7:30 a.m. to 8:00 a.m., spend about four hours at her two hospitals, and would then spend another four to six hours at home (or, if it was a Wednesday, at the office) entering information into the computer system.  According to Garcia, her workdays typically ended between 5:30 p.m. and 7:00 p.m., but could go as late as 10:00 p.m. or 11:00 p.m.  Garcia stated she worked, on average, between eight and eleven hours per day.  Garcia also testified she worked on the weekends approximately twice per month, for two to four hours at a time, and usually on Saturdays.  Garcia estimated she worked, in total, an average of 57 hours per workweek.

### 7.    Sherri Hodsdon

Plaintiff Sherri Hodsdon worked for Centene from July 16, 2008, to October 8, 2010, and primarily performed concurrent reviews. Hodsdon worked in San Antonio, Texas. For the first three months of Hodsdon's employment with Centene, she worked in the office, but then transitioned to working at home and conducting on-site and telephonic reviews at hospitals. Hodsdon testified her typical workday began at approximately 7:00 a.m., and she would do between one and two-and-a-half hours of work from home before heading to her assigned hospital. Hodsdon testified she would spend from two to three hours at the hospital gathering the information she needed before returning home to process her authorizations within the CCMS system. Hodsdon stated her typical practice was to eat lunch while working, even when she was working from home. According to Hodsdon, her typical day ended at 6:00 p.m., and she worked between eleven and twelve hours every day, five days per week. Hodsdon testified she worked between 50 and 55 hours in a typical work week.

Hodsdon explained her TAT was originally 48 hours, but the TAT became more stringent once Centene began trying to become accredited, although she was not sure when that was. According to Hodsdon, all URNs in her office were subject to the same TATs. Hodsdon testified she tried to complete all her assigned reviews on the day they came in, and noted her office would sometimes take some of the workload from the Corpus Christi office. Finally, Hodsdon explained she complained to her managers about the workload, and specifically asked whether more URNs would ever be hired because she felt the office was short-staffed. According to Hodsdon, Esmeralda Cazares-Baig told Hodsdon "her hands were tied" because Centene was not clearing their office to hire any additional staff.

8.      **Shelly Cattoor**

Shelly Cattoor, whom Plaintiffs called as an adverse witness, was Plaintiffs' key witness on the issue of willfulness. Cattoor is Centene's director of compensation,[3] and her department is responsible for the FLSA classifications of various jobs within Centene, including the classification of URNs. Cattoor testified URNs were—and still are—classified as exempt from overtime under the FLSA, and explained she believes URNs are properly classified as exempt under both the learned professional and administrative exemptions. Cattoor testified the original URN classification decision happened a long time ago, and was unable to say definitely when the decision happened, who made the decision, or why the decision was made. According to Cattoor, she "maintained" the classification by reviewing the URN job description, but was unable to say when she conducted that review. Cattoor testified the FLSA classifications for both URNs had been reviewed both before and after this lawsuit was filed.

Cattoor explained the job description for prior authorization URNs changed in 2011, and it was Centene's policy and practice to review the FLSA classification of a position whenever a job description is changed. However, Cattoor was unable to say who performed a FLSA review in 2011, although she stated that person would either have been herself or her boss, Linda Galina. Plaintiffs admitted several Centene worksheets and checklists used for reviewing the FLSA classifications of particular positions, including an administrative exemption worksheet, an FLSA compliance checklist, a job description questionnaire, and a learned professional exemption worksheet, *see* Tr. Exs. P-162, P-163, P-164, P-165, and Cattoor testified Centene did not have a completed version of

---

[3] Cattoor is employed by Centene Management Company, which is evidently a parent of Defendant Centene. Cattoor testified Defendant Centene "is the company of the health plan that has the contract between Texas and [Centene Management Company]." Cattoor Trial Tr. at 14:12–25.

any of those forms for the URN position.  Cattoor stated those forms were typically used only when a new type of job was first created, not during periodic reviews, and testified her team was familiar enough with the content of those forms they did not need them to accurately assess FLSA classification issues.

With respect to her own review of the job descriptions for URNs, Cattoor testified she did not do any research into whether the job duties set forth in the descriptions actually matched the job duties URNs performed on a daily basis.  According to Cattoor, she relied on local management to provide her with that type of information, and was never told by local management that URN job duties had changed such that they deviated from the written description.  On cross-examination, Cattoor testified the local managers and local human resources people were responsible for the classification of particular jobs as exempt or non-exempt under the FLSA.

Following redirect, the Court asked Cattoor whether Centene had intentionally failed to reclassify URNs as non-exempt since this Court ruled on summary judgment that URNs are non-exempt.  Cattoor confirmed Centene intentionally decided not to change the FLSA exemption status following this Court's ruling.

9.      **Esmeralda Cazares-Baig**

Finally, Centene called Esmeralda Cazares-Baig as its sole witness on direct.  Cazares-Baig is currently Centene's senior vice president of complex care operations, and was formerly the vice president of utilization management.  In her former role, Cazares-Baig oversaw the day-to-day operations of the utilization management team.  Cazares-Baig noted she was once a concurrent review URN, and testified she was familiar with the job duties of both concurrent and prior authorization URNs.  Cazares-Baig testified that she had "nothing to do" with FLSA exemption

decisions.   Following that testimony, Plaintiffs objected to the relevance of Cazares-Baig's testimony, and the Court sustained Plaintiffs' objection, ruling Cazares-Baig's testimony irrelevant because she was not a decision maker who consulted with Cattoor or any other person at Centene who actually made the FLSA exemption decision regarding URNs.

Findings of Fact & Conclusions of Law

Having considered the testimony of the witnesses, the admitted exhibits, and the parties' stipulations, the Court now enters the following findings of fact and conclusions of law.  First, the Court finds Centene did not act willfully in misclassifying Plaintiffs, and therefore that a two-year limitations period applies to this action.  Second, the Court finds with respect to all but one non-testifying Plaintiff, Angelita Cervantez, Plaintiffs carried their burden to demonstrate the number of hours Plaintiffs worked by a matter of just and reasonable inference, and concludes Defendant failed to carry its burden to negate the reasonableness of that inference.  Third, the Court declines to exercise its discretion to withhold an award of liquidated damages in this case.  Finally, the Court sets forth its findings relevant to a final calculation of damages, to which all remaining Plaintiffs are entitled.

## I.      Willfulness & Statute of Limitations

The issue of whether an employer's violation of the FLSA was willful determines the statute of limitations that applies to the violation.  *See* 29 U.S.C. § 255(a).  If the violation was not willful, a two-year limitations period applies.  *Id.*  If the violation was willful, however, a three-year limitations period applies.  *Id.*  In a collective action, the limitations period is tolled for the original party plaintiffs on the date the complaint is brought, and for the later opt-in plaintiffs on the date their notices of consent are filed with the court.  *Id.* § 256(a)–(b).

An employer willfully violates the FLSA if the employer "knew or showed reckless disregard for . . . whether its conduct was prohibited by the [FLSA.]" *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  The regulations implementing the FLSA define "reckless disregard" as "failure to make adequate inquiry into whether conduct is in compliance with the act." 5 C.F.R. § 551.104.  Read consistently with *McLaughlin*, a "failure to make adequate inquiry" must mean more than a negligent or unreasonable failure.  *See McLaughlin*, 486 U.S. at 135 & n.13.  Further, the failure to seek legal advice concerning pay practices does not, taken alone, demonstrate a willful violation, *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1416 (5th Cir. 1990) (citing *McLaughlin*, 486 U.S. at 134–35), although consultation with an attorney may help prove that an employer lacked willfulness, *Mumby v. Pure Energy Servs. (USA), Inc.*, 636 F.3d 1266, 1270 (10th Cir. 2011).  The plaintiff bears the burden of proving willfulness.  *See McLaughlin*, 486 U.S. at 135.

Courts in this Circuit and others have found the following types of evidence support a finding of willfulness: an employer's admission it knew it was violating the FLSA prior to suit, *see Singer v. City of Waco*, 324 F.3d 813, 821–22 (5th Cir. 2003) (fire chief admitted he was aware firefighters were being paid incorrectly); an employer's continuation of a pay practice after being put on notice the practice violated the FLSA, *see Reich v. Bay, Inc.*, 23 F.3d 110, 117 (5th Cir. 1994) (local Wage and Hour office director informed employer its overtime practices violated the FLSA); an employer's prior violations of the FLSA, *see Chao v. A-One Med. Servs.*, 346 F.3d 908, 919 (9th Cir. 2003) (noting prior FLSA violations, even though not found willful, put employer on notice of FLSA requirements); *Sealey v. Emcare, Inc.*, No. 2:11-CV-00120, 2013 WL 164040, at *4 (S.D. Tex. Jan. 14, 2013) (evidence employer previously litigated "a closely related overtime issue" sufficient to find willfulness); and an employer's reliance on a blanket policy a certain type of employee was exempt,

absent any review or study of whether any exemption applied, *see Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1280–81 (11th Cir. 2008) (employer never studied whether employees were exempt yet knew the employees in question spent most of their time performing manual labor).

Though it is a close question, the Court finds Plaintiffs have failed to carry their burden to prove Centene acted willfully in violating the FLSA. To be sure, Centene's track record concerning the classification of URNs is extremely unimpressive, particularly given Centene is a large, publicly traded company that employs hundreds of URNs nationwide. As for the initial classification decision, Centene had no idea when that decision was made, who made the decision, why the exempt classification was chosen, or what exemptions were relied upon by the decision maker. Shelley Cattoor, a top Centene FLSA decision maker, stated she was not sure when she had last reviewed the URN job descriptions for accuracy, though maintained she had done so. Cattoor indicated "[t]he FLSA status was reviewed" when the job description for one type of URN changed in 2011, but was unable to say who conducted that review. Further, Cattoor testified she believed URNs qualified for the learned professional exemption—despite her knowledge federal regulations indicate jobs which can be performed by licensed practical nurses are generally nonexempt, and that licensed practical nurses can perform the URN job. When pressed as to why she believed URNs still qualified for the learned professional exemption, Cattoor, visibly uncomfortable, cited the alleged applicability of the administrative exemption. That, of course, is no answer at all.

Given all of the above, it is clear Centene was negligent in failing to conduct a more comprehensive review of the URN job descriptions and their exempt status. Negligence, however, does not equate to willfulness. There was no evidence Centene knew it was violating the FLSA prior to suit, had been placed on notice the classification violated the FLSA, had previously violated the

FLSA, or failed *entirely* to review the exemption status of URNs. While whatever review Centene conducted was plainly insufficient, the Court credits Cattoor's testimony that some scanty review did in fact take place.

During closing argument, Plaintiffs argued Centene acted willfully because it had knowledge the URN position was chronically understaffed and URNs regularly complained about their hours. The evidence certainly did show Plaintiffs complained to management about the number of hours they were working. Their complaints, however, were not couched in terms of expecting to be paid more for overtime; rather, Plaintiffs framed their dissatisfaction in terms of short-handedness and feeling spread too thin. Karen Calabrese, for example, testified she asked her supervisor whether Centene would be hiring more nurses; Rita Valdez complained to her supervisor about how difficult it was to meet the productivity goals set by Centene without working long hours; Cordelia Garcia told her superiors her hours were becoming increasingly difficult as the workload increased; and Sherri Hodsdon asked her supervisors whether the URNs "were ever going to get any help" because Hodsdon felt they were "short-staffed." While it is true that given the frequency of complaints from URNs regarding hours, a reasonable company might have taken a far more searching look at the URN exemption classification (if only to protect itself from liability), it does not follow Centene showed reckless disregard for whether it was violating the FLSA in failing to do so.

Because the Court finds Centene did not act willfully in misclassifying Plaintiffs, the two-year limitations period applies to this action. Because the two-year limitations period applies, the following Plaintiffs' claims are barred by limitations: Cynthia Cantu, whose employment with Centene ended on February 2, 2011, and who filed her notice of consent on June 5, 2013; Cordelia Garcia, whose employment with Centene ended on August 26, 2010, and who filed her notice of

consent on June 28, 2013; Sherri Hodsdon, whose employment with Centene ended on October 8, 2010, and who filed her notice of consent on June 5, 2013; and Margueriette Schmoll, whose employment with Centene ended on January 27, 2010, and who filed her notice of consent on February 22, 2012.  Accordingly, Plaintiffs Cynthia Cantu, Cordelia Garcia, Sherri Hodsdon, and Margueriette Schmoll are DISMISSED from this lawsuit.

## II.    Hours Worked by Plaintiffs

Under the FLSA, an employee who sues for unpaid overtime bears the burden of proving he performed work for which he was not properly compensated. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946), *superseded by statute on other grounds as explained in Integrity Staffing Solutions, Inc. v. Busk*, 135 S. Ct. 513, 516–17 (2014).  Ordinarily, the employee can meet that burden by requesting his time records from his employer—but where the employer has failed to keep accurate time records, a problem arises.  *Id.* at 687.  Recognizing that "[t]he solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work," as that result would excuse the employer from his legal duty to keep proper time records, *see* 29 U.S.C. § 211(c), the Supreme Court imposed a significant burden on such employers:

> In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Mt. Clemens*, 328 U.S. at 687–88.  "Plainly, then, although the initial burden is on the employee, that burden is a minimal one.  Where the employer has failed to keep adequate employment records, it pays for that failure at trial by bearing the lion's share of the proof."  *Sec'y of Labor v. DeSisto*, 929 F.2d 789, 792 (1st Cir. 1991).

## A.     The Testifying Plaintiffs

As specifically set forth below, the Court finds each of the testifying Plaintiffs have met their burden to show the amount and extent of their work performed as a matter of just and reasonable inference.  Additionally, the Court finds Centene failed to carry its burden to produce either evidence of the precise amount of work performed or evidence to negative the reasonableness of the inference to be drawn from the testifying Plaintiffs' evidence.  Each testifying Plaintiff is discussed in turn.

### 1.     Karen Calabrese

The Court concludes Karen Calabrese's testimony was sufficient to show, as a matter of just and reasonable inference, that she worked an average of 11 hours per day during Monday through Friday, and including work performed during the evenings and on Saturdays, an average of 58 hours per seven-day workweek.  Although Calabrese testified to a 63-hour average workweek, the Court finds the evidence reasonably supports a 58-hour average workweek.  The parties disputed the accuracy of Calabrese's estimation she worked three Saturdays every month, as her 90-day evaluation indicated she worked "5 extra Saturdays" during that three-month period of time.  During some months, Calabrese may have worked three Saturdays; during others, she may have worked two Saturdays, or one Saturday.  The Court finds Calabrese's testimony reasonably supports an average of two Saturdays worked per month.  At an average of 6 hours per Saturday, the Court will add 3 hours per week to Calabrese's 55-hour Monday through Friday average, for a total of 58 hours per

week. Calabrese is not required to prove her hours with precision, and the Court finds a 58-hour average is reasonably supported by the evidence.

The parties stipulated Calabrese worked for 38 workweeks during the two-year limitations period. *See* Stipulated Facts [#141-1] Ex. A. The parties further stipulated to the accuracy of Centene's records concerning the days Calabrese took time off from work. After removing the weeks in which Calabrese's time off dropped the hours she worked to 40 or below, the Court finds Calabrese worked overtime for which she was not paid during 32 workweeks. During 28 of those 32 weeks, Calabrese took no days off; thus, during each of those weeks, she is entitled to 18 hours of overtime (58-hour workweek - 40 hours = 18 hours). During the remaining 4 of 32 weeks, Calabrese took one day off; thus, during those weeks, she is entitled to 7 hours of overtime (58-hour workweek - one 11-hour day = 47 hours - 40 hours = 7 hours).

Because Calabrese met her burden, the burden shifted to Centene to either prove the precise amount of worked performed or negative the reasonableness of the inference to be drawn from Calabrese's evidence. Centene failed to carry that burden. Centene's primary argument on this point concerning Calabrese—and indeed, concerning all of the Plaintiffs, testifying and non-testifying—is that its records from the CCMS computer system indicate Plaintiffs' estimates of hours worked are exaggerated. The Court is unpersuaded by this argument. As DeSalvo testified, CCMS is not a timekeeping system and URNs are not required to track their hours through CCMS. Further, the CCMS records do not account for the time Plaintiffs spent at work while they were attending nurses' meetings, attending mandatory trainings, or engaged in activities outside of the CCMS system such as making phone calls, attending to email, sending faxes, and the like. Nor do the CCMS records account for the time spent by concurrent review nurses in traveling to hospitals and, once on-site,

gathering the information they would need to later process authorizations. Additionally, DeSalvo testified there were periods of time in which the CCMS system would experience technical difficulties that made it impossible to process authorizations, but that when such difficulties occurred, the URNs were expected to continue working. Given all of the above, the Court concludes the CCMS records are unhelpful to the analysis and neither demonstrate the precise number of hours worked nor negative the reasonableness of the inferences drawn from the testifying Plaintiffs' evidence.

Centene further argued that Calabrese's testimony she worked approximately three Saturdays per month was inconsistent with her 90-day evaluation. The Court is not persuaded that this single comment in Calabrese's evaluation negatives the reasonableness of Calabrese's estimates on the whole, and has taken the disparity into account in considering what Calabrese's evidence reasonably proved. Accordingly, Centene failed to carry its burden, and Calabrese is entitled to damages.

### 2.    Margueriette Schmoll

Although Margueriette Schmoll's claims against Centene are time-barred, because her testimony was offered as representative testimony establishing the number of hours worked by the non-testifying Plaintiffs, the Court must ascertain what Plaintiffs proved concerning Schmoll. The Court finds Schmoll's testimony was sufficient to show, as a matter of just and reasonable inference, that she worked an average of 10 hours per day, Monday through Friday, and 54 hours per workweek, accounting for evenings and weekends.

The burden therefore shifted to Centene to negative the reasonableness of that inference. The only argument Centene offered on this point, other than the CCMS argument the Court has already rejected, was that Schmoll's testimony indicated she worked most or all of her overtime during the

last few months of her employment while supervised by Elizabeth England. Centene's argument, however, does not fairly characterize Schmoll's testimony. Schmoll testified she worked overtime under all three of her supervisors, and that the overtime increased over the length of her employment. Centene failed to carry its burden as to Schmoll's hours worked.

### 3.    Rita Valdez

The Court concludes Rita Valdez's testimony was sufficient to show, as a matter of just and reasonable inference, that she worked an average of 10 hours per day during Monday through Friday, and including work performed during the evenings and on Saturdays, an average of 51 hours per seven-day workweek. The parties stipulated Valdez worked for 63 workweeks during the two-year limitations period. *See* Stipulated Facts [#141-1] Ex. A. The parties further stipulated to the accuracy of Centene's records concerning the days Valdez took time off from work. After removing the weeks in which Valdez's time off dropped the hours she worked to 40 or below, the Court finds Valdez worked overtime for which she was not paid during 50 workweeks.

During 38 of those 50 weeks, Valdez took no days off; thus, during each of those weeks, she is entitled to 11 hours of overtime (51-hour workweek - 40 hours = 11 hours). During the remaining 12 of 50 weeks, Valdez took one day off; thus, during each of those weeks, she is entitled to 1 hour of overtime (51-hour workweek - one 10-hour day = 41 hours - 40 hours = 1 hour).

Again, the burden shifted to Centene to negative the reasonableness of that inference, and again, Centene failed to do so. Other than its CCMS argument, Centene pointed only to Valdez's answers to interrogatories, in which she gave a higher estimate of the number of hours she worked weekly than the one she gave at trial. The Court is not persuaded Valdez's differing recollection negatives the reasonableness of the inference to be drawn from the evidence. If anything, it indicates

-22-

over the course of this litigation, Valdez reflected on the number of hours she worked to the best of her ability based on the information she had at the time.  Valdez is entitled to damages.

### 4.    Cynthia Cantu

Although Cynthia Cantu's claims against Centene are time-barred, because her testimony was offered as representative testimony establishing the number of hours worked by the non-testifying Plaintiffs, the Court must ascertain what Plaintiffs proved concerning Cantu.  The Court finds Cantu's testimony was sufficient to show, as a matter of just and reasonable inference, that she worked an average of 11 hours per day, and 55 hours per workweek.

The burden therefore shifted to Centene to negative the reasonableness of that inference. Centene proffered no argument concerning Cantu's evidence other than pointing to CCMS. Consequently, the Court finds Centene failed to carry its burden.

### 5.    Cordelia Garcia

As with Schmoll and Cantu's claims, Cordelia Garcia's claims against Centene are time-barred.  Because her testimony was offered as representative testimony, however, the Court must ascertain what Plaintiffs proved.  The Court finds Garcia's testimony was sufficient to show, as a matter of just and reasonable inference, that she worked an average of 9.5 hours per day, Monday through Friday, and 49 hours per workweek, accounting for evenings and weekends.

While Garcia testified she believed she worked an average of 57 hours per week, the Court finds her testimony supports an inference of only 49 hours per week.  As previously noted, Garcia testified she worked between 8 and 11 hours per day Monday through Friday, and worked between 2 and 4 hours on Saturday approximately twice per month.  Based on those estimates, Garcia worked

an average of 9.5 hours per day, or 47.5 hours per five-day workweek, and six hours per month on Saturdays, or an additional 1.5 hours per week.

Because Garcia proved her hours worked by just and reasonable inference, the burden shifted to Centene to negative the reasonableness of that inference. Centene proffered no argument concerning Garcia's evidence other than pointing to CCMS and noting the disparity between Garcia's daily estimates and her estimate of total weekly hours worked, which the Court has already accounted for in its finding. Consequently, the Court finds Centene failed to carry its burden.

### 6.    Sherri Hodsdon

Sherri Hodsdon's claims are also barred by limitations. However, because her testimony is offered as representative testimony, the Court must again ascertain what Plaintiffs proved. The Court finds Hodsdon's testimony was sufficient to show, as a matter of just and reasonable inference, that she worked an average of 10.5 hours per day, and 52.5 hours per workweek.

Once again, the burden shifted to Centene, and once again, Centene offered no evidence other than its interpretation of the CCMS records. Consequently, Centene failed to carry its burden.

## B.    The Non-Testifying Plaintiffs

The central dispute in this case is whether the hours worked by the six testifying Plaintiffs are fairly representative of the hours worked by the twenty non-testifying Plaintiffs. Unsurprisingly, Centene argues the six testifying Plaintiffs are not representative of the remainder of the collective class, and thus that no one other than the testifying Plaintiffs whose claims are not barred by limitations may collect damages. The Court disagrees with Centene.

Under *Mt. Clemens*, FLSA plaintiffs may present testimony from representative employees as part of their proof of the prima facie case. *Albanil v. Coast 2 Coast*, 444 F. App'x 788, 806 (5th

Cir. 2011) (unpublished).  Damages may be awarded to non-testifying plaintiffs based on the "fairly representational" testimony of other employees." *Id.*; *see also Reich v. S. Md. Hosp., Inc.*, 43 F.3d 949, 951 (4th Cir. 1995); *DeSisto*, 929 F.2d at 792.  It is Centene's position that under the Fifth Circuit's decision in *Albanil v. Coast 2 Coast, Inc.*, testifying employees can only be "fairly representational" of non-testifying employees if the testifying employees have personal knowledge of the hours worked by the non-testifying employees. *See* Mot. Judgment [#149] at 3–4.  The Court cannot agree.

Centene's characterization of the *Albanil* decision relies upon its self-serving (and eyebrow-raising) insertion of the word "only" into the following quote: "'Testimony of some employees concerning the hours worked by groups of non-testifying employees is [only] sufficient if those who do testify have personal knowledge of the work performed by those who do not.'"  *Id.* (citing *Albanil*, 444 F. App'x at 807).  The relevant question is not whether the testifying employees have such personal knowledge, but rather, whether the plaintiffs have produced sufficient evidence, whatever the type, to show their hours worked as a matter of just and reasonable inference.  *See Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825, 829 (5th Cir. 1973) (finding testimony of 16 employees and one government investigator sufficient to establish a prima facie case that 37 employees worked unreported overtime).  Accepting Centene's interpretation would mean in all FLSA collective actions where the plaintiff-employees worked alone or had limited contact with one another, all of the plaintiffs would be required to testify in order to establish hours worked, as none or few of them would have personal knowledge of each others' hours.  That is not the law.  *See, e.g.*, *Albanil*, 444 F. App'x at 806 (stating under *Mt. Clemens*, plaintiffs may "establish a *prima facie* case for non-testifying employees based on the 'fairly representational' testimony of other employees");

*DeSisto*, 929 F.2d at 792 ("It is well established that not all employees need testify in order . . . to recoup back wages. Rather, [plaintiffs] can rely on testimony and evidence from representative employees to meet the initial burden of proof requirement."); *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 67 (2d Cir. 1997) ("In meeting the burden under *Mt. Clemens*, [plaintiffs] need not present testimony from each underpaid employee; rather, it is well-established that [plaintiffs] may present the testimony of a representative sample of employees as part of [their] proof of the prima facie case under the FLSA.").

The real question is whether the six Centene URNs who testified are fairly representational of the twenty who did not, and relatedly, whether their testimony plus the other evidence in the record is sufficient to establish the *Mt. Clemens* prima facie case for the non-testifying twenty. Considering all of the evidence in the record, the Court finds the six testifying employees are fairly representational of the twenty non-testifying employees, such that their testimony, plus the documentary evidence in the record, is sufficient to establish a prima facie case for the non-testifying employees as a matter of just and reasonable inference.

In most cases where a small number of employees have been permitted to represent the interests of a larger number, the representative employee or employees performed substantially similar or identical work to the non-testifying employees. *S. Md. Hosp.*, 43 F.3d at 951 (citing *DeSisto*, 929 F.2d at 793; *McLaughlin v. Ho Fat Seto*, 850 F.2d 586 (9th Cir. 1988); *McLaughlin v. DialAmerica Mktg., Inc.*, 716 F. Supp. 812 (D.N.J. 1989)). Additionally, where several different job categories exist, "a minimum of one representative from each category with first-hand knowledge is essential." *Id.* (citing *DeSisto*, 929 F.2d at 793). Depending on the nature of the facts to be proved, "a very small sample of representational evidence can suffice." *S. New England*

-26-

*Telecomms.*, 121 F.3d at 68. Ultimately, the "focus is not on the numbers in isolation but on whether the district court could reasonably conclude that there was 'sufficient evidence to show the amount and extent of . . . [uncompensated] work as a matter of just and reasonable inference.'" *Id.* at 67 (quoting *Mt. Clemens*, 328 U.S. at 687).

Here, two variables bear most strongly upon the question whether the testifying Plaintiffs are fairly representative of the non-testifying Plaintiffs: first, the type of reviews each nurse performed, and second, the office in which each nurse worked. The evidence at trial showed the structure of Plaintiffs' workdays varied depending upon the types of reviews they performed, most importantly because, as Centene noted in its closing argument, concurrent review nurses must travel to their assigned hospitals in order to collect the patient information they need to conduct their reviews, while prior authorization nurses are not assigned to hospitals. Sixteen of the 26 Plaintiffs were concurrent review nurses; 9 of the 26 Plaintiffs were prior authorization nurses; and the remaining one Plaintiff began as a concurrent review nurse, then later was a prior authorization nurse. Of the six testifying Plaintiffs, two were prior authorization nurses, and four were concurrent review nurses. Additionally, Plaintiffs worked in five different Centene offices: Austin, Corpus Christi, Dallas, Lubbock, and San Antonio. Four of the testifying Plaintiffs worked in the Austin office; one in the Corpus Christi office; and one in the San Antonio office. No testimony concerning the Dallas office or the Lubbock office was admitted.

The Court concludes the testifying Plaintiffs are fairly representative of the non-testifying Plaintiffs, with the sole exception of non-testifying Plaintiff Angelita Cervantez. Despite the fact that concurrent review nurses traveled to hospitals during their workdays and prior authorization review nurses did not, both types of URNs performed the same core function: conducting reviews

of medical necessity based upon a body of information about specific patient cases gathered either electronically, over the telephone, or in person, and entering reports of their reviews into the CCMS computer system. That core function could be performed either from home or from an office setting, as all nurses could log on to CCMS from their home and office computers. Both types of nurses testified that when they completed all of their assigned work, they were assigned more. Further, the number of hours worked by both types of nurses proved at trial are roughly equivalent: the two testifying prior authorization nurses proved an average of 54 and 58 hours, while the four concurrent review nurses proved an average of 49, 51, 52.5, and 55 hours. Although Plaintiffs worked in different offices, the evidence at trial also showed that URNs in all of the offices were subject to the same TATs mandated by Texas law and the NCQA, and further, that the offices collaborated by taking work from one another. Numerous emails sent to some of the non-testifying Plaintiffs from the Austin, San Antonio, and Dallas offices indicating mandatory overtime, optional overtime, discussions of the heavy caseload, extra hours, and the like corroborate the testifying Plaintiffs' testimony. *See, e.g.*, Pls.' Tr. Exs. P-57–P-86, P-101–P-110, P-113–P-117, P-119–P-123 (Austin office); *id.* at P-147, P-151 (San Antonio office); P-150–P-152 (Dallas office). As to the Plaintiffs working in the Austin, Corpus Christi, Dallas, and San Antonio offices, the Court concludes Plaintiffs have met their burden under *Mt. Clemens*.

However, the Court has no evidence in the record, either testimonial or documentary, concerning the Lubbock office. No testifying Plaintiff stated her office shared work with the Lubbock office, and no documentary evidence gives the Court information about the work environment in the Lubbock office. The Court therefore concludes Plaintiffs have failed to meet their burden to demonstrate the number of hours worked by Plaintiff Angelita Cervantez as a matter

of just and reasonable inference. Accordingly, Cervantez is DISMISSED from this lawsuit. However, the remaining non-testifying Plaintiffs—Kathy Clark, Amy Endsley, Emily English, Susan Grimmett, Sunshine Hartnagel, Penny Riley, Jane Townsend, Kevin Ulrich, Laureen Sparrow, Timothy Centeno, Julia DeLeon, Jill Galvan, Carolyn Garza, Maricela Graciano-Ramos, Yasira Hunter, Jose Longoria, Karen Moreno, Winston Pubien, and Anna Serratos—are entitled to damages.

Because the Court concludes the testifying Plaintiffs are fairly representative of the non-testifying Plaintiffs, the Court will calculate the non-testifying Plaintiffs' damages by applying the average of the testifying Plaintiffs' hours worked per day—10.3 hours—and per week—53.3 hours—to the non-testifying Plaintiffs, whose records concerning time off from work and salary per week are also a part of the undisputed record. *See Albanil*, 444 F. App'x at 806; *Baden-Winterwood v. Life Time Fitness*, 729 F. Supp. 2d 965, 999–1000 (S.D. Ohio 2010) (using testifying plaintiffs' average hours worked per week to calculate damages for non-testifying plaintiffs). The Court rejects Centene's argument awarding damages in this manner amounts to impermissible speculation. As Centene failed to keep accurate records of the hours its URNs worked, Centene "cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had [it] kept records in accordance with the requirements of [the FLSA]." *Mt. Clemens*, 328 U.S. at 688. "Nor is such a result to be condemned by the rule that precludes the recovery of uncertain and speculative damages. That rule applies only to situations where the fact of damage is itself uncertain. But here . . . the employee has proved that he has performed work and has not been paid in accordance with [the FLSA]. The damage is therefore certain." *Id.*

## III.    Liquidated Damages

Under the FLSA, an employer who violates the overtime provisions is liable not only for the unpaid overtime compensation, but also for "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).   Liquidated damages in this context are compensatory, not punitive; they "constitute[] compensation for the retention of a work[er]'s pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945).

The district court can decline to award such damages, or reduce the amount awarded, if the court concludes the employer acted in "good faith" and had "reasonable grounds" to believe its actions complied with the FLSA. 29 U.S.C. § 260. An employer, however, "'faces a substantial burden of demonstrating good faith and a reasonable belief that its actions did not violate the FLSA.'" *Singer v. City of Waco, Tex.*, 324 F.3d 813, 823 (5th Cir. 2003) (internal quotes omitted) (quoting *Bernard v. IBP, Inc.*, 154 F.3d 259, 267 (5th Cir. 1998)).  A finding the employer did not act willfully is not sufficient to establish it acted in good faith.  *S. New England Telecomms.*, 121 F.3d at 71 (citing *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 909 (3d Cir. 1991)). Additionally, even if the district court determines the employer acted in good faith and with a reasonable belief its actions were legal, the court may nevertheless award liquidated damages. *Bernard*, 154 F.3d at 267 (citing *Lee v. Coahoma Cnty.*, 937 F.2d 220, 226 (5th Cir. 1991)).

Centene argues the Court should exercise its discretion to withhold liquidated damages in this case because no legal precedents placed Centene on notice its classification of URNs violated the FLSA. The Court declines to do so, and awards liquidated damages to the remaining Plaintiffs. Centene has not carried its substantial burden to show it acted in good faith and with a *reasonable*

-30-

belief its actions were legal.  As previously discussed, the failure of a large, national company to conduct a comprehensive, documented review of the FLSA-exempt status of URNs—particularly given the number of URN positions which exist nationwide, the workload associated with those positions, and the trend in FLSA jurisprudence toward examination of the actual job duties of personnel in making exemption decisions—simply boggles the mind.  Centene's actions were legally irresponsible and unreasonable, and this Court will not reward Centene by exercising its discretion in Centene's favor.

## IV.   Damages Owed

In sum, the Court's findings which will provide the basis for an award of damages are as follows:

| | |
|---|---|
| Karen Calabrese: | Average of 11 hours per day & 58 hours per week |
| Margueriette Schmoll: | Average of 10 hours per day & 54 hours per week |
| Rita Valdez: | Average of 10 hours per day & 51 hours per week |
| Cynthia Cantu: | Average of 11 hours per day & 55 hours per week |
| Cordelia Garcia: | Average of 9.5 hours per day & 49 hours per week |
| Sherri Hodsdon: | Average of 10.5 hours per day & 52.5 hours per week |

Average daily hours worked by non-testifying employees:      10.3 hours

Average weekly hours worked by non-testifying employees:     53.3 hours

Plaintiffs Schmoll, Cantu, Garcia, and Hodsdon cannot recover damages, as their claims are time-barred.  Angelita Cervantez will not collect damages, as Plaintiffs failed to prove her prima facie case.  All remaining Plaintiffs are limited to their damages within the two-year statutory period, and all remaining Plaintiffs are entitled to liquidated damages.

The parties agree that damages must be calculated in accord with the fluctuating workweek or "half-time" method, which "calls for dividing the actual hours worked each workweek into the fixed salary" to determine each Plaintiff's regular rate of pay for that workweek, then "multiplying all hours over 40 in the workweek by ½ the regular rate for that workweek" to determine the overtime payment due for that workweek. *Blackmon v. Brookshire Grocery Co.*, 835 F.2d 1135, 1138–39 (5th Cir. 1988). The parties have stipulated to each Plaintiff's weekly fixed salary, into which, week by week, the Court will divide the average weekly hours worked by that Plaintiff to determine the regular rate of pay.

Additionally, as previously noted, the parties have stipulated to the accuracy of Centene's records concerning the time each employee was absent from work. In order to ascertain the number of weeks for which a particular Plaintiff is eligible for overtime, the Court will account for absences by subtracting, for each day that Plaintiff was absent from work in a particular week, his or her average daily hours worked from his or her average weekly hours worked. For example, during the week beginning July 15, 2012, Karen Calabrese took one day off. For that week, 11 hours must be subtracted from Calabrese's 58-hour weekly average, for a total of 47 hours worked that week, entitling Calabrese to 7 hours of overtime in that week.

Because of the detailed nature of the required calculations, and because the Court's findings as to hours worked differ in some cases from those submitted to the Court, the parties are ordered, within twenty days from date of entry of this order, to meet, confer, and attempt to agree upon the damages to which each of the remaining Plaintiffs are entitled consistent with these findings of fact and conclusions of law. If the parties are unable to agree, the Court orders them to file a notice to that effect, and within ten days from the date of filing that notice, to submit their separate

calculations of damages along with explanations of same.    In that case, following review of the parties' calculations, the Court will enter its final judgment setting forth its award of damages.

### Conclusion

Accordingly:

IT IS ORDERED that Plaintiffs Rose Guajardo and Angelita Cervantez's claims against Defendant Centene Company of Texas, L.P. are DISMISSED WITHOUT PREJUDICE;

IT IS FURTHER ORDERED that Plaintiffs Cynthia Cantu, Cordelia Garcia, Sherri Hodsdon, and Margueriette Schmoll's claims against Defendant Centene Company of Texas, L.P. are DISMISSED WITH PREJUDICE as time-barred;

IT IS FURTHER ORDERED that Centene's Motion for Judgment on Partial Findings [#149] is GRANTED IN PART and DENIED IN PART as described in this opinion; and

IT IS FINALLY ORDERED that, within twenty (20) days from the date of entry of this order, the parties meet, confer, and attempt to come to an agreement regarding calculation of damages consistent with these findings of fact and conclusions of law. If the parties are unable to agree, they shall file a notice with the Court to that effect, and within ten (10) days from the date of filing of that notice, file with the Court their separate calculations of damages along with explanations of same.

SIGNED this the _11th_ day of May 2015.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE

174 ffcl ba.frm                                              -33-